# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VANTAGE COMMODITIES FINANCIAL
SERVICES I, LLC
c/o EDF Trading North America
4700 West Sam Houston Parkway North #250
Houston, Texas 77041,

              Plaintiff,

v.

                                    Civil Action No._____

ASSURED RISK TRANSFER PCC, LCC
1090 Vermont Avenue, NW
Washington, DC 20005,                        DEMAND FOR JURY TRIAL

WILLIS LIMITED
The Willis Building
51 Lime Street
London EC3M 7DQ
United Kingdom,

WILLIS RE INC.
Brookfield Place
200 Liberty Street
3rd Floor
New York, New York 10281,

WILLIS TOWERS WATSON
MANAGEMENT (VERMONT), LTD.
100 Bank St. Ste 500
Burlington, VT 05401-4699,

HANNOVER RUCKVERISHCERUNG AG
(a/k/a Hannover Re)
Karl-Wiechert-Allee 50
Hannover
Niedersachsen
Germany,

PARTNER REINSURANCE EUROPE PLC
(a/k/a Partner Re)
Wellesley House South
90 Pitts Bay Road

Pembroke
Bermuda,

SYNDICATE 4472
(a/k/a LIBERTY SYNDICATES)
1 Lime Street
London ECBM 7HA
United Kingdom,

SYNDICATE 2001
(a/k/a MS AMLIN)
1 Lime Street
London ECBM 7HA
United Kingdom,

SYNDICATE 1206
(a/k/a AM TRUST)
1 Lime Street
London ECBM 7HA
United Kingdom,

CATLIN RE SWITZERLAND
(a/k/a XL CATLIN)
O'Hara House
One Bermudiana Road
Hamilton
Bermuda,

and

CAISSE CENTRALE DE RÉASSURANCE
157, Boulevard Haussmann
Paris
Ile-de-France
France,

                        Defendants.

## COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plaintiff Vantage Commodities Financial Services I, LLC ("Vantage"), by its

undersigned counsel, files this complaint for breach of contract, declaratory judgment,

2

negligence, professional negligence, negligent undertaking, and negligent misrepresentation against the above-named Defendants arising out of the failure to pay losses covered by a reinsurance-backed credit insurance policy.  This suit is effectively a collection action to collect on a more than $26 judgment that has been entered following an arbitration award. Vantage and/or its affiliate, Vantage Commodities Financial Services, LLC, paid significant premiums for Credit Insurance Policy No. TC2013/001 or TCXXXXX/001 (the "Credit Insurance Policy" or "Policy").  These premiums were paid to ART PCC LLC ("ART PCC") and the above named reinsurers Hannover Ruckverishcerung AG (a/k/a Hannover Re), Partner Reinsurance Europe plc (a/k/a Partner Re), Syndicate 4472 (a/k/a Liberty Syndicates), Syndicate 2001 (a/k/a MS Amlin), Syndicate 1206 (a/k/a Am Trust), Catlin Re Switzerland (a/k/a XL Catlin) and Caisse Centrale de Réassurance (collectively, "Reinsurer Defendants").

Reinsurer Defendants were legally obligated to pay at least 90% of losses covered under the Credit Insurance Policy "on the same terms, conditions, and settlements as the" Policy.  ART PCC retained the remaining 10% of the payment obligation under the Policy. ART PCC and Reinsurer Defendants contractually agreed to pay Vantage in the event that energy company Glacial Energy Holdings ("Glacial") failed to repay credit that Vantage had extended to it.  In November 2013, Glacial failed to repay.  Vantage placed Glacial into default, and Vantage provided notice of a claim under the Credit Insurance Policy.  ART PCC, Reinsurer Defendants and several Willis entities (collectively, "Willis"), which managed ART PCC and served as reinsurance intermediaries, were all provided timely notice of Vantage's declaration of default against Glacial, and Vantage's corresponding insurance claim.

ART PCC, on behalf of itself and Reinsurer Defendants, refused to pay Vantage in breach of the Policy.  Meanwhile, ART PCC, Reinsurer Defendants, and Willis pursued ongoing business together, whereby they coordinated and sold reinsurance-backed insurance policies to other insureds. Vantage instituted arbitration under the Policy. Vantage served its demand for arbitration on Paul Palmer, President and sole member of ART PCC, whom Reinsurer Defendants identified as their "Key Man" for the Credit Insurance Policy.  Vantage also served the demand on Willis, who acted as the Manager for ART PCC and also acted as the "Intermediary" agent for Reinsurer Defendants and ART PCC.  ART PCC engaged Debevoise & Plimpton LLP to represent it in the arbitration, and ART PCC vigorously contested Vantage's insurance claim.

In December 2016, a three-member arbitrator panel, comprised of retired judges James Robertson, William Bassler, and Richard Cohen, unanimously ruled that Vantage is entitled to coverage under the Credit Insurance Policy and awarded Vantage more than $25.5 million.  The arbitration award has been confirmed as a judgment for more than $26 million with added accrued prejudgment interest. Vantage demanded that ART PCC and Reinsurer Defendants pay the judgment.  Neither ART PCC nor Reinsurer Defendants, however, have paid the judgment.  ART PCC contends that it lacks any funds to pay the judgment and that the reinsurance purchased to back the credit insurance policy was intended to pay at least 90% of the award to Vantage.  Reinsurer Defendants, on the other hand, have refused to pay, asserting that their "Key Man" at ART PCC and their "Intermediary" agents at Willis failed to keep Reinsurer Defendants adequately advised of developments in Vantage's insurance claim.  Whatever disputes may exist between ART PCC, Reinsurer Defendants, and Willis, Vantage is entitled to have the judgment paid in full by Defendants.  Reinsurer Defendants,

200367.00002/105837992v.4

ART PCC, and Willis cannot seek to benefit themselves, and profit from, their internal disputes at the expense of Vantage.  As a result of Defendants' conduct, Vantage has been deprived of the benefit of insurance for which it paid substantial premiums, and Vantage has incurred substantial additional damages.

## JURISDICTION AND VENUE

1.       The Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.       The Court has personal jurisdiction over Defendants because this action arises from Defendants' (i) transaction of business within the District of Columbia, (ii) contracting to supply services in the District of Columbia; and/or (iii) contracting to insure or act as a surety for or on any person, property, or risk contract, obligation, or agreement located, executed, or to be performed within the District of Columbia.

3.       Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendants transact business in this District, and Defendants are subject to personal jurisdiction in this District.

## PARTIES

4.       Plaintiff Vantage Commodities Financial Services I, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Texas.

5.       Defendant ART PCC, LLC (f/k/a Vantage Re PCC, LCC) is limited liability company organized and licensed as a captive insurance company under the laws of the District of Columbia with its principal place of business in the District of Columbia.

200367.00002/105837992v.4

6.      On information and belief, Defendant Willis Towers Watson Management (Vermont), Ltd. (f/k/a Willis Management (Vermont), Ltd.) ("Willis Management") is limited liability company organized under the laws of Vermont with its principal place of business in Vermont.

7.      On information and belief, Defendant Willis Limited is a company organized under the laws of the United Kingdom with its principal place of business in the United Kingdom.

8.      On information and belief, Defendant Willis Re Inc. ("Willis Re") is a company organized under the laws of New York with its principal place of business in New York.

9.      On information and belief, Defendant Hannover Ruckverishcerung AG (a/k/a Hannover Re) is a corporation organized under the laws of Germany with its principal place of business in Germany.

10.      On information and belief, Defendant Partner Reinsurance Europe plc (a/k/a Partner Re) is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

11.      On information and belief, Defendant Syndicate 4472 (a/k/a Liberty Syndicates) is organized under the laws of the United Kingdom with its principal place of business in the United Kingdom.

12.      On information and belief, Defendant Syndicate 2001 (a/k/a MS Amlin) is organized under the laws of the United Kingdom with its principal place of business in the United Kingdom.

200367.00002/105837992v.4

13.     On information and belief, Defendant Syndicate 1206 (a/k/a Am Trust) is organized under the laws of the United Kingdom with its principal place of business in the United Kingdom.

14.     On information and belief, Defendant Catlin Re Switzerland (a/k/a XL Catlin) is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

15.     On information and belief, Defendant Caisse Centrale de Réassurance is a limited liability company (société anonyme) organized under the laws of France and has its principal place of business in France.

FACTS RELEVANT TO ALL COUNTS

Arbitration Award and Judgment

16.     Vantage procured the Credit Insurance Policy from ART PCC to protect it from potential losses in connection with credit that Vantage extended to an energy company, Glacial. A true and correct copy of the Credit Insurance Policy is attached hereto as Exhibit 1.

**17.**     The Credit Insurance Policy has a policy period from January 11, 2013 to January 11, 2014 and a maximum limit of liability of $22 million.  Vantage paid substantial premiums for the Credit Insurance Policy.  Vantage is the loss payee under the Policy.

18.     After Glacial failed to repay the credit extended to it by Vantage and Vantage declared Glacial in default on or about November 12, 2013, Vantage suffered significant credit losses from the transaction with Glacial and sought coverage for its losses under the Credit Insurance Policy.

7

19.     ART PCC denied Vantage's claim for coverage arising from the Glacial transaction on the ground that Vantage purportedly failed to comply with the Minimum Collateralization Level ("MCL") provision in the Policy.

20.     Vantage vigorously disputed ART PCC's coverage denial and initiated an arbitration pursuant to the terms of the Credit Insurance Policy against ART PCC before a panel of three arbitrators – each a former judge – to enforce the Credit Insurance Policy (the "Arbitration").

21.     The arbitration panel issued a Final Award in Vantage's favor, unanimously holding that Vantage complied with the MCL provision and was entitled to coverage up to the full $22 million limit under the Credit Insurance Policy.  The Final Award granted Vantage $22 million in damages, plus prejudgment interest of $3,439,450, plus $74,587.50 costs of arbitration, for a total arbitration award of $25,514,037.50.  A true and correct copy of the Final Award (the "Arbitration Award" or "Final Award") is attached hereto as Exhibit 2.

22.     The Supreme Court of New York confirmed the Arbitration Award and entered judgment against ART PCC, in the amount of the Final Award, $25,514,037.50, and further ordered that Vantage was entitled to pre-judgment interest in the amount of $773,809.30 and costs and disbursements in the amount of $505.00, as well as post judgment interest, which continues to accrue.  The judgment, not including post judgment interest, totals $26,288,351.80.  A true and correct copy of the Order and Judgment (the "Judgment") is attached hereto as Exhibit 3.

23.     Under the Credit Insurance Policy, at least 90% (approximately $19.8 million) of the financial liquidity for the Policy is provided by reinsurance.  The remaining amount of the Policy limit was retained by ART PCC.

24.     To date, the Arbitration Award and Judgment remain unsatisfied.

## ART PCC, LLC

25.     ART PCC was formed by Mr. Palmer and several other individuals in April 2012 for the sole purpose of providing reinsurance-backed credit insurance to Vantage.  Throughout the timeframe of the Credit Insurance Policy, Vantage was the only insured of ART PCC, which was originally known as "Vantage Re PCC, LLC" (until March 2104 when Mr. Palmer changed its name).

26.     ART PCC is organized as a protected cell captive insurance company under the laws of the District of Columbia and became licensed on April 6, 2012.  A true and correct copy of ART PCC's April 29, 2016 Certificate of Authority is attached as Exhibit 4**.**

27.     Mr. Palmer has been the President of ART PCC since it was established and the sole member of ART PCC since on or about May 2013.

28.     Neither Vantage nor any of its affiliates or employees owns, or has ever owned, either directly or indirectly, any interest in ART PCC.

## Willis

29.     Although Mr. Palmer presented himself to Vantage as knowledgeable of and experienced in the insurance industry, Mr. Palmer testified at deposition during the Arbitration that, prior to his involvement with ART PCC, he had no prior experience establishing or operating a captive insurance company or handling insurance claims.

30.     Mr. Palmer and ART PCC worked with several Willis entities, which managed ART PCC and advised and assisted ART PCC with the procurement and maintenance of reinsurance to back the Credit Insurance Policy.  Willis also undertook to serve as the

200367.00002/105837992v.4

intermediary between ART PCC and Reinsurer Defendants and as such was the dual agent of ART PCC and Reinsurer Defendants.

31.     The Willis entities involved with ART PCC and the Credit Insurance Policy were Willis Limited, Willis Re, and Willis Management and included the following Willis personnel, among others:  Aiden Kelly, the then Chief Operations Officer and Compliance Officer for Willis' Global Captive Practice, David Guerino, Senior President of Willis's Global Captive Practice, and Brian Stewart, Executive Director of "Willis Re."

32.     Willis Limited and Willis Re provide reinsurance advisory and brokerage services and hold themselves out as "one of the world's leading reinsurance advisors" with "a deep understanding of risk":

> Willis Re is one of the world's leading reinsurance advisors. Over our 180-year history, we have developed a deep insight into all aspects of the global insurance industry. In particular, we understand how individual insurance companies develop and drive their own unique strategies to achieve their goals. We offer you comprehensive service backed by stable, well-trained staff to help you reach and exceed your specific targets in the most cost-effective fashion.

> We have a deep understanding of risk – and all the ways it affects capital and your organization's financial performance. Our core focus is to provide you with a superior understanding of the risks you face, and then advise you on the best ways to manage extreme outcomes.

http://www.willisre.com/About_Willis_Re/.

33.     Willis Management provides management services to captive insurance companies and, in the performance of those services, coordinates with other entities throughout Willis and reinsurance brokers.  According to Willis Management's website, Willis Management's personnel are "experts in designing and managing captives for clients in domiciles across the world, using our local knowledge and consulting expertise to ensure they

create maximum value" and "focus on one goal: ensuring the long term success of your captive." *See* http://www.willis.com/client_solutions/services/captives/.

34.     According to Willis Management's website, Willis Management "has established effective relationships with the Regulators in each domicile, all major (and many minor) fronting insurers and reinsurers, broking houses etc. to facilitate the smooth and effective administration of your captive insurance program." *Id.*

35.     Willis Management's website explains that the captive management services it provides include certain "key technical functions" including "Insurance Management," which includes "Claims handling, administration and reporting" and "Liaison with insurance and reinsurance brokers." *Id.*

36.     Willis Management's website touts the "Consulting and Technical Support" that it offers, including "The resources and expertise elsewhere throughout Willis." *Id.*

37.     Mr. Palmer also obtained legal advice from Debevoise & Plimpton LLP with respect to the formation of ART PCC, the drafting of the Credit Insurance Policy, and the handling of claims under the Credit Insurance Policy.   Debevoise & Plimpton also represented ART PCC during the Arbitration.

**Reinsurer Defendants**

**38.**     One of the principal components of creating ART PCC and establishing the insurance to be provided for Vantage was that the direct liquidity for 90% of the $22 million Credit Insurance Policy limit would be comprised of reinsurance placed by ART PCC and Willis.

39.     ART PCC and Willis procured reinsurance for the Credit Insurance Policy through their contacts at Reinsurer Defendants and identified the reinsurers for the Policy on credit insurance binders, which were issued to Vantage prior to and after the inception of the

11

Credit Insurance Policy.  The direct relationship of the reinsurance to Vantage's Policy was shown on credit insurance binders that were prepared for the Credit Insurance Policy.

40.     ART PCC provided Reinsurer Defendants with a vehicle for accessing the direct insurance market and the ability to collect premiums from Vantage, in exchange for the contractual obligation that Reinsurer Defendants directly pay any covered loss "on the same terms, conditions and settlements" as the Credit Insurance Policy.  Reinsurer Defendants thus availed themselves of the benefits of this access through the District of Columbia special purpose entity to collect premiums from Vantage.

41.     ART PCC has described the amounts that it charged under the Policy as being comprised of premiums and fees for the services that it provided in enabling direct access to Reinsurer Defendants.

### Credit Insurance Binders

42.     Prior to the inception of the Credit Insurance Policy, Vantage made clear to ART PCC that its acceptance of the Credit Insurance Policy was contingent upon the existence of reinsurance to pay losses covered by the Credit Insurance Policy.

43.     ART PCC and Willis understood that it was essential to Vantage that reinsurance be available to pay losses covered under the Credit Insurance Policy.  According to Mr. Palmer of ART PCC, who testified at deposition during the Arbitration, Vantage insisted on being involved in the selection and approval of the reinsurers who were to provide reinsurance for Vantage's losses.

44.     ART PCC and Willis provided Vantage with Credit Insurance Binders that provided confirmation of the reinsurance that backed up the Credit Insurance Policy. The first Credit Insurance Binder, dated December 28, 2012, was provided to Vantage prior to the inception date of the Credit Insurance Policy while the second Credit Insurance Binder, dated

August 19, 2013, was provided to Vantage after the inception date of the Credit Insurance Policy.

45.     The first Credit Insurance Binder, dated December 28, 2012, is signed by Mr. Kelly, the then COO and Compliance Officer of Willis's Global Captive Practice.  A true and correct copy of the December 28, 2012 Credit Insurance Binder is attached hereto as Exhibit 5.

46.     The December 28, 2012 Credit Insurance Binder states that the "Coverage" is "[t]o indemnify the Insured, in Policy Currency, for the Insured Percentage of the Insured's loss caused solely and directly by nonpayment of an Eligible Credit, pursuant to the terms of the attached insurance policy."  The December 28, 2012 Credit Insurance Binder indicated that "Maximum Limit of Liability" was $22 million and the "Insured Percentage" was "100%."

47.     As to reinsurance, the terms of the December 28, 2012 Credit Insurance Binder represented that the "Reinsurance Ceded" was $19.8 million per risk and confirmed that "[r]einsurance is ceded on the same terms, conditions and settlements as the original policy."  The December 18, 2012 Credit Insurance Binder identified certain reinsurers and the amount by which each agreed to reinsure the Credit Insurance Policy, including two of Reinsurer Defendants, "Hannover Ruckverishcerung AG" and "Partner Reinsurance Europe plc."

48.     ART PCC and Willis Management provided Vantage with a second "revised" Credit Insurance Binder dated August 19, 2013, which was signed by Mr. Kelly.  A true and correct copy of the August 19, 2013 Credit Insurance Binder is attached as Exhibit 6.

49.     The August 19, 2013 Credit Insurance Binder stated that it was a "revised binder of insurance and intended to provide confirmation" to Vantage that the "Credit Insurance Policy has been issued by Vantage Re PCC, LLC per the terms outlined" in the August 19, 2013 Credit Insurance Binder.

13

50.     Like the December 28, 2012 Credit Insurance Binder, the August 19, 2013 Credit Insurance Binder stated that the Maximum Limit of Liability is "USD 22,000,000" and that the "Insured Percentage" is "100%."

51.     Like the December 28, 2012 Credit Insurance Binder, the terms of the August 19, 2013 Credit Insurance Binder confirmed that the "Reinsurance Ceded" is "USD 19,800,000" and that "Reinsurance is ceded on the same terms, conditions and settlements as the original policy."

52.     The list of reinsurers and their corresponding shares listed in the August 19, 2013 Credit Insurance Binder was not the same as the list in the December 28, 2012 binder.  The reinsurers listed in the August 19, 2013 Credit Insurance Binder are the reinsurers that agreed to provide reinsurance for the Credit Insurance Policy:

| Hannover Ruckvericherung AG | up to 25% |
|---|---|
| Partner Reinsurance Europe plc | up to 18% |
| Lloyd's of London | up to 41% |
| Caisse Centrale de Réassurance | up to 11% |
| Catlin Re Switzerland AG | up to 5% |

**The Reinsurance's Purpose**

53.     The Credit Insurance Binders highlight the important role that reinsurance played in providing financial support and liquidity for the Credit Insurance Policy and demonstrate that Mr. Palmer, ART PCC, Willis Management, Willis Limited knew and understood that role.

54.     Mr. Palmer, ART PCC, Willis Management, Willis Re, and Willis Limited intended for Vantage to rely on the Credit Insurance Binders as confirmation that reinsurance

14

backed up the insurance policy and would be available to pay losses under the Policy, and that

Mr. Palmer, ART PCC, Willis Management, and Willis Limited would take the steps necessary

to ensure that the reinsurance was available in the event that Vantage suffered a covered loss,

and would not do anything to jeopardize its availability; otherwise, there would be no point in

listing the reinsurers, if the reinsurance would be unavailable.

55.     Vantage relied on the representations and reassurances in the Credit Insurance

Binders, among others, concerning the availability of reinsurance to pay potential losses.  Had

Vantage known that Mr. Palmer, Willis Management, Willis Re, and Willis Limited would not

preserve the availability of the reinsurance, Vantage would and could have purchased

alternative insurance or made other risk management arrangements.

56.     Vantage paid and ART PCC, the Reinsurer Defendants, and Willis all collected

valuable premiums and fees based on these representations in the Credit Insurance Binders.

57.     Like ART PCC and Willis, Reinsurer Defendants knew and understood that the

purpose of the reinsurance that they agreed to provide as stated in the Credit Insurance Binders

was to compensate Vantage in the event it suffered a loss.  The advantage to Reinsurer

Defendants of insuring Vantage through ART PCC was that Reinsurer Defendants were able to

collect premiums from insureds like direct insurance companies operating in the District of

Columbia while bypassing any regulatory, licensing or other legal or regulatory requirements

that they may otherwise apply to such insurance companies.

58.     Reinsurer Defendants knew and understood at the time that the Credit Insurance

Binders were provided to Vantage that ART PCC was formed solely to provide credit insurance

for Vantage and that Vantage was ART PCC's only insured.  Reinsurer Defendants agreed to

provide reinsurance based on information that ART PCC and Willis provided them concerning

Vantage and the Glacial transaction.  Mr. Palmer testified at deposition during the Arbitration

that ART PCC provided Reinsurer Defendants with Glacial's financials and access to an

"intralink" website containing information concerning Vantage and Glacial, which was active

through or until November 2013.

59.     Indeed, Debevoise & Plimpton, the law firm that assisted in the creation and

structure of ART PCC and its reinsurance backing, explained during the Arbitration that ART

PCC was created as "a special-purpose vehicle, created by the Parties to provide access to

reinsurance capital . . . ."

60.     ART PCC did not maintain capital sufficient to pay the Credit Insurance Policy

limits other than the reinsurance, which was designed to directly pay Vantage in the event of a

covered loss.

61.     Indeed, Reinsurer Defendants agreed to provide reinsurance backing in excess of

the $22 million Credit Insurance Policy limits, extending reinsurance backing for ART PCC's

liabilities to Vantage up to a $33 million limit.

62.     Per the design of ART PCC and Reinsurer Defendants, the reinsurer ceded

underwriting and claims handling authority to Mr. Palmer.  Debevoise & Plimpton again

explained during the Arbitration that ART PCC had been assigned the role of "gatekeeper to the

pool of reinsurance capital."

63.      Further highlighting that the reinsurance was intended to compensate Vantage

directly in the event it suffered a covered loss, Mr. Palmer testified at deposition during the

Arbitration that it would be "between [Reinsurer Defendants] and Vantage" as to Reinsurer

Defendants' payment of an arbitration award.

16

**Reinsurance Agreements**

64.     The reinsurance agreements that were issued to back up the Credit Insurance

Policy consist of two reinsurance agreements (collectively, "Reinsurance Agreements"), which

were subscribed to by Reinsurer Defendants.

65.     One of the Reinsurance Agreements is numbered STT7082 and is signed by Mr.

Stewart as the "Account Executive" responsible for brokering the reinsurance and his colleague

at Willis, Ben Bradbury as the "London Technician" and "2nd Pair of Eyes" (the "Willis

Reinsurance Agreement).  A true and correct copy of the Willis Reinsurance Agreement is

attached hereto as Exhibit 7.  Reinsurer Defendants that subscribed to the Willis Reinsurance

Agreement are:  Syndicate 4472 (Liberty Syndicates), Syndicate 1206 (Am Trust), Syndicate

2001 (MS Amlin), and Caisse Centrale de Réassurance.

66.     The second reinsurance agreement is subscribed to by Hannover Re and Partner

Re (the "Hannover Reinsurance Agreement"). A true and correct copy of the Hannover

Reinsurance Agreement is attached hereto as Exhibit 8.  A true and correct copy of a Facultative

Reinsurance Placement Slip is attached hereto as Exhibit 9.

67.     Vantage was not provided with copies of the Reinsurance Agreements until long

after the Credit Insurance Policy incepted on January 11, 2013 and Vantage had paid substantial

premiums to ART PCC and Reinsurer Defendants based on, inter alia, the contractual

obligations described in the Credit Insurance Binders and the Credit Insurance Policy.

68.     As promised in the Credit Insurance Binders, the Reinsurance Agreements

indicated that Reinsurer Defendants agreed to reinsure at least 90% of Vantage's losses covered

under the Credit Insurance Policy.

17

69.     The Reinsurance Agreements, however, also contained provisions, not disclosed in the Credit Insurance Binders, that were inconsistent with the representation that the reinsurance was ceded on "the same terms, conditions, and settlements" as the Credit Insurance Policy and were completely at odds with the purpose of the reinsurance.

70.     Unbeknownst to Vantage at the time the Credit Insurance Policy took effect, the Reinsurance Agreements included provisions designed to insulate Reinsurer Defendants from paying Vantage's losses.  First, the Reinsurance Agreements each contained a provision purporting to limit Reinsurer Defendants' obligations to ART PCC.  Second, the Reinsurance Agreements each contain a provision requiring the arbitration of disputes under the Reinsurance Agreements before "current or past executive officers of insurance or reinsurance companies." Vantage is not bound by such agreements or terms.  Indeed, Vantage understood that any arbitration pursuant to the Credit Insurance Policy would bind Reinsurer Defendants.

### Reinsurer Defendants' Key Man

71.     As another layer of protection, Reinsurer Defendants designated Mr. Palmer as their "Key Man," mandating that he remain employed by ART PCC as condition to providing reinsurance.  Both of the Willis Reinsurance Agreement and the Hannover Reinsurance Agreement contain a "Key Man" clause that identifies Mr. Palmer as Reinsurer Defendants' Key Man:

> The named underwriter of the Company is hereby noted as Paul Palmer.  In the event that Paul Palmer ceases to be employed by the Company, or an affiliate of the Company, then the Reinsurers shall have the right to terminate or renegotiate the terms of this Agreement as of the latest day of employment of Paul Palmer, but only in respect of Policies written on or after such date.

72.     Reinsurer Defendants' designation of Mr. Palmer as their key man demonstrates that Reinsurer Defendants entrusted Mr. Palmer with the responsibility for protecting Reinsurer Defendants' interests, and ceded to him the roles of underwriting Vantage's risks and handling

18

Vantage's insurance claims.  So important was Mr. Palmer's continued involvement to

Reinsurer Defendants that, in the event that Mr. Palmer ceased to be employed by ART PCC,

Reinsurer Defendants reserved the right to terminate the Reinsurance Agreements.

<u>**Willis's Role as Reinsurance Intermediary**</u>

73.     In addition to providing advice and assistance with respect to the Reinsurance

Agreements, Willis also served as the intermediary under the Reinsurance Agreements.

74.     The Willis Reinsurance Agreement contains an "Intermediary" provision in the

Risk Details that expressly identifies Willis Limited and Willis Re Inc. as the intermediaries:

> Willis Limited . . . and Willis Re Inc. . . . are recognised as the intermediaries
> negotiating this Contract, through whom all communications and payments
> relating thereto shall be transmitted to both parties.  Payments by the Reinsured to
> either Intermediary will be deemed payment to the Reinsurer.  Payments by the
> Reinsurer to either Intermediary will be deemed payment to the Reinsured only to
> the extent that such payments are actually received by the Reinsured.

75.     The Hannover Reinsurance Agreement contains an "Intermediary Clause" that

identifies an entity called "Gill and Roeser, Inc." as the "Intermediary" and that "[a]ll

communications . . . shall be transmitted to the Reinsurer with copies to Gill and Roeser, Inc. . .

." Mr. Palmer testified at his deposition during the Arbitration that Willis replaced Gill and

Roeser, Inc. as the "Intermediary" under the Hannover Reinsurance Agreement.

76.     The captive management services that Willis Management provided to ART

PCC included coordinating with Willis Limited and Willis Re and serving as an intermediary

with the Reinsurer Defendants.  Senior Vice President and Managing Director of Willis

Management, David Guerino, sent an e-mail dated March 10, 2014 to Vantage advising

Vantage that Vantage Re (PCC) LLC had changed its name to Assured Risk Transfer (PCC),

LLC effective March 6, 2014 and that "Premium formerly paid to Vantage Re should now be

paid to Assured Risk Transfer (PCC), LLC ("ART").  Upon receipt, Willis Management

200367.00002/105837992v.4

(Vermont) Ltd as manager of ART will remit payment to ART's reinsurers led by Hannover Re as is customary." A true and correct copy of Mr. Guerino's March 10, 2014 e-mail is attached as Exhibit 10.

77.     Willis received compensation for its services as intermediary under the Reinsurance Agreements from premiums paid by Vantage.

78.     As the intermediary under the Willis Reinsurance Agreement and the Hannover Reinsurance Agreement, Willis was responsible for communicating information about claims under the Credit Insurance Agreement and the Reinsurance Agreements to Reinsurer Defendants in timely manner.  Mr. Palmer testified at his deposition during the Arbitration that communicating with Mr. Stewart and Willis was the equivalent of communicating with Reinsurer Defendants.

79.     Willis knew and understood that the purpose of the reinsurance was to compensate Vantage in the event that it suffered a covered loss. Willis undertook a duty to Vantage to perform its responsibilities as a reinsurance advisor, broker, manager of ART PCC, and intermediary with reasonable skill and ordinary diligence within the professional standards of care applicable to insurance and reinsurance brokers and managers of captive insurance companies, which included promptly conveying loss and claims information to Reinsurer Defendants and taking other steps to preserve the availability of reinsurance to pay potential claims.

80.     Willis knew or should have known that its failure to adequately perform its duties would jeopardize, and did jeopardize, the availability of the reinsurance to compensate Vantage for claims covered under the Credit Insurance Policy.

**Glacial's Default**

81.     During the policy period of the Credit Insurance Policy, Vantage's transaction with Glacial was the only transaction covered under the Credit Insurance Policy.

82.     On November 11, 2013, Vantage sent Glacial a notice of default, and, on November 12, 2013, Vantage notified ART PCC of the Notice of Default issued to Glacial and provided it with a copy of the notice.

83.     Mr. Palmer testified at his deposition during the Arbitration that, within a week of his receipt of the Notice of Default, he told Mr. Stewart of Willis, with whom Mr. Palmer spoke weekly or more, about the Notice of Default.  According to Mr. Palmer, Mr. Stewart said he would notify Reinsurer Defendants about the Notice of Default.

84.     Reinsurer Defendants have conceded that they received notice of Vantage's default of Glacial that Vantage submitted as notice of a claim to ART PCC.

**ART PCC's, Willis's, and Reinsurer Defendants' Ongoing Business Relationship**

85.     Mr. Palmer testified at his deposition during the Arbitration that on or about the date of the Notice of Default, ART PCC and Willis were starting to consider "other [business] opportunities."

86.     After Vantage did not renew the Credit Insurance Policy, whose policy period ended on January 11, 2014, ART PCC, Willis, and Reinsurer Defendants took steps to sell reinsurance-backed insurance policies to other insureds.  In March 2014, Mr. Palmer changed the name of the insurer from Vantage Re PCC to ART PCC and established additional cells within ART PCC, and Reinsurer Defendants continued to maintain the Reinsurance Agreements in force.

87.     On information and belief, ART PCC, Willis, and Reinsurer Defendants did in fact sell reinsurance-backed insurance policies to other insureds, and, as a result, ART PCC, Willis, and Reinsurer Defendants earned substantial premiums and/or commissions.

### Glacial's Bankruptcy

88.     Vantage continued to work with Glacial after sending the Notice of Default in an attempt to minimize the loss from Glacial's inability and failure to repay the credit Vantage had extended.

89.     Glacial was unable to recover and filed for bankruptcy in April 2014.

90.     Vantage provided notice of Glacial's bankruptcy to Mr. Palmer and ART PCC.

91.     Mr. Palmer testified in his deposition during the Arbitration that he likely advised Mr. Stewart during their frequent conversations about Glacial's bankruptcy.

92.     Reinsurer Defendants have conceded in correspondence that Willis and Reinsurer Defendants were provided with updates concerning the Glacial bankruptcy, and corresponding Vantage Credit Insurance Claim.

### Vantage's Proof of Loss

93.     As a result of Glacial's bankruptcy, Glacial failed to repay the $44 million of credit extended by Vantage and insured under the Credit Insurance Policy.

94.     Vantage submitted a Proof of Loss dated November 19, 2014 to ART PCC seeking payment under the Credit Insurance Policy for Vantage's Loss.  A true and correct copy of Vantage's Proof of Loss is attached hereto as Exhibit 11.

95.     Mr. Palmer testified in his deposition during the Arbitration that, within a week of receiving the November 19, 2014 Proof of Loss, he called Mr. Stewart and notified him of the Proof of Loss and the amount of the loss for the purpose of notifying Reinsurer Defendants

about the Proof of Loss.  Mr. Palmer also testified that he may have informed Mr. Guerino of

the Proof of Loss, as well.

96.     Mr. Palmer testified in his deposition during the Arbitration that Mr. Stewart did

not ask Mr. Palmer for a copy of the Proof of Loss.

### ART PCC's Coverage Denial

97.     Vantage and Mr. Palmer had a number of meetings at which Mr. Palmer advised

Vantage that the loss arising out of the Glacial transaction was not covered.  Mr. Palmer had

decided to deny Vantage's claim prior to receiving Vantage's Proof of Loss.

98.     Vantage made clear during the meetings and in other communications that

Vantage disputed Mr. Palmer's determination.

99.     Nevertheless, by letter dated April 6, 2015, Mr. Palmer formally notified Vantage

in writing that ART PCC was denying coverage for its claim under the Credit Insurance Policy.

A copy of the April 6, 2015 letter is attached hereto as Exhibit 12.

100.    The sole basis for ART PCC's coverage denial was Vantage's alleged failure to

comply with the MCL provision.

101.    Mr. Palmer's April 6, 2015 letter also advised that he retained Nicholas Potter of

Debevoise & Plimpton LLP to represent ART PCC.  Mr. Palmer testified at his deposition

during the Arbitration that, prior to sending the April 6, 2015 denial letter, Mr. Palmer retained

Debevoise & Plimpton LLP to advise him concerning the investigation and handling of and best

response to Vantage's claim for coverage.

102.    Although Mr. Palmer was aware that Vantage disputed ART PCC's coverage

denial, Mr. Palmer's April 6, 2015 letter stated:  "We are obligated to act in utmost good faith in

our dealings with our reinsurers.  Bringing a claim that we do not believe is supported by the

200367.00002/105837992v.4

facts or the terms of the Insurance Policy is not something we are prepared to do."  Mr.

Palmer's actions and statements were consistent with undertaking both the underwriting and

claims handling role for both ART PCC and Reinsurer Defendants.

103.    Mr. Palmer testified at his deposition during the Arbitration that he continued to

communicate with Mr. Stewart during the period from November 2014 to June 2015.

104.    Mr. Palmer testified at his deposition during the Arbitration that he had frequent

communications with representatives of Willis Management, including Mr. Guerino and that he

made Mr. Guerino aware at various times of Vantage's claim for coverage.

### Vantage's Arbitration Demand

105.    Vantage's counsel responded to ART PCC's coverage denial by letter dated June

22, 2015, which was sent to Mr. Palmer and Mr. Potter (Debevoise & Plimpton LLP), as well as

Mr. Guerino of Willis Management.  A true and correct copy of Vantage's counsel's June 22,

2015 letter is attached hereto as Exhibit 13.

106.    Vantage's counsel's June 22, 2015 letter disputed ART PCC and Mr. Palmer's

basis for denying Vantage's claim for insurance coverage.  The letter concluded by requesting a

meeting with ART PCC, but stated that if ART PCC fails to acknowledge its insurance

obligations and/or fails to schedule the requested meeting, "then this letter will be deemed as

Vantage's demand for arbitration under . . . the Credit Policy."

107.    In addition, Vantage's counsel's June 22, 2015 letter specifically directed ART

PCC and Mr. Palmer to "immediately advise the reinsurers of the Loss and the reinsurers'

obligation to pay the reinsured."

108.     In response to Vantage's counsel's letter, Mr. Potter of Debevoise & Plimpton LLP sent a letter dated July 7, 2015 in which Mr. Potter disputed Vantage's counsel's interpretation of the Credit Insurance Policy and stated that "[t]here is no coverage."

109.     Mr. Potter's letter concluded by stating that "Mr. Palmer is willing to hold a meeting with Vantage if Vantage considers that to be constructive; however, we are also happy to proceed to arbitration if your client considers that to be a sensible use of its resources."

110.     By letter dated July 7, 2015, Vantage's counsel sent a letter in response to Mr. Potter and sent copies of the letter to Mr. Palmer and Mr. Guerino.  The letter stated that "it does not appear that another meeting would be constructive, and that instead both sides agree that Arbitration for our dispute has been commenced under the terms of the policy."

111.     Vantage's July 7, 2015 letter also requested that the recipients "immediately confirm that ART PCC has advised the reinsurers of Vantage's claim for insurance, and that ART PCC has taken all steps to satisfy any and all conditions for obtaining reinsurance upon Vantage's enforcement of its rights under the Credit Insurance."

112.     Mr. Palmer testified in his deposition during the Arbitration that he advised Mr. Stewart that Vantage and ART PCC were proceeding to arbitration, for the purpose of informing Reinsurer Defendants of the arbitration.

## Renewal Of The Reinsurance Agreements

113.     In December 2015 (more than a year after the term of the Credit Insurance Policy concluded), ART PCC, Willis, and Reinsurer Defendants met to discuss the renewal of the Reinsurance Agreements in connection with other business opportunities that they were pursuing.

200367.00002/105837992v.4

114.    In connection with Mr. Palmer's December 2015 reinsurance renewal for ART

PCC's insurance operations, Mr. Palmer provided Reinsurer Defendants with an update that

included a statement that "Vantage continues to try to justify a claim, we and our lawyers,

continue to think their claim is without merit; while they have mentioned arbitration, we are

confident this will not result in a reinsurance claim."  On information and belief, the Reinsurer

Defendants did not engage in any further inquiry in response to Mr. Palmer's update of

Vantage's continued insurance claim.

115.    Mr. Palmer testified at his deposition during the Arbitration that he had

conversations in connection with the December 2015 reinsurance renewal with Mr. Stewart and

his coworker at Willis, Mr. Bradbury, about Vantage and the Arbitration in connection with the

renewal of the Reinsurance Agreements.  Mr. Palmer testified that he remembered telling Mr.

Stewart that the Arbitration was ongoing.

116.    Mr. Palmer testified at his deposition during the Arbitration that Mr. Stewart and

Mr. Bradbury would have advised Reinsurer Defendants of the status of the Arbitration.

### The Arbitration

117.    During the Arbitration, Vantage continued to press ART PCC and its counsel,

Debevoise & Plimpton LLP, to confirm that the Reinsurance Agreements remained available to

pay a potential arbitration award.

118.    During the preliminary case management conference with the arbitration panel,

ART PCC's counsel represented to the arbitration panel that ART PCC would produce

documentary evidence to demonstrate that the insurer had sufficient assets to satisfy an

arbitration award, including documents demonstrating that reinsurance would be available to

pay an arbitration award.

26

119.    After ART PCC failed to produce its correspondence with Reinsur Defendants in response to Vantage's discovery requests, Vantage moved to compel the production of ART PCC's reinsurance communications.  Vantage also filed a Motion for Security requesting that the arbitration panel direct ART PCC to provide security, such as a bond or other appropriate guarantee, to satisfy any potential arbitration award.

120.    In response, ART PCC and Debevoise & Plimpton LLP made representations to Vantage and the arbitration panel dated June 8, 2016 to provide assurances that the reinsurance would pay any arbitration judgment.  ART PCC and Debevoise submitted a detailed filing that "reinsurance has always existed for a compensable claim" and "ART [PCC] hereby expressly confirms that in verbal communications between Mr. Palmer and representatives of the reinsurers, ART [PCC] has informed the reinsurers of Vantage's claim, ART [PCC's] response to that claim, and the existence of the arbitration."  A true and correct copy of ART PCC's June 8, 2016 letter is attached hereto as Exhibit 14.

121.    During a status conference on June 15, 2015, ART PCC's counsel made representations regarding the availability of the reinsurance to pay any arbitration award.

122.    Following the status conference, the arbitration panel by Order dated June 15, 2016 directed "counsel for ART PCC, LLC confirm in writing her representations as to reinsurance coverage made during the status conference" and that Vantage may take the deposition of Paul Palmer regarding "ART PCC's communications with reinsurers about Vantage's claim" and "Premiums paid by ART PCC to reinsurers."  A true and correct copy of the June 15, 2016 Order is attached hereto as Exhibit 15.

200367.00002/105837992v.4

123.     In accordance with the June 15, 2016 Order, ART PCC and Debevoise & Plimpton submitted a letter dated June 20, 2016 to the arbitration panel.  A true and correct copy of the June 20, 2016 letter is attached hereto as Exhibit 16.

124.     In the June 20, 2016 letter, Debevoise & Plimpton confirmed that ART PCC had complied with the notice provisions in the Reinsurance Agreements by providing verbal notifications to the reinsurance broker, Willis, and that the verbal notifications to Willis were sufficient to comply with the Reinsurance Agreement requirements:

- ART hereby expressly confirms that it has notified the reinsurers of Vantage's claim and the ensuing dispute, including this arbitration, through verbal communications between Mr. Palmer and Willis, in its capacity as the reinsurance broker.

- Article XV.A of both reinsurance agreements requires ART to 'promptly notify' the reinsurers of each claim and all subsequent developments.  The reinsurance agreements do not prescribe a specific form for notice to the reinsurers, and both agreements either allow or require communications between ART and the reinsurers be effected through the broker serving as the intermediary for purposes of the agreements.[]

- Pursuant to these provisions, and in fulfillment of its contractual obligations, ART notified the reinsurers through verbal communication to Willis as follows:

  1.     Within a week of the 12 November 2013 letter from Vantage to ART,[] Mr. Palmer informed Brian Stewart of Willis that Vantage and EDFT had issued a Notice of Default to Glacial.

28

2.      Within a week of the 19 November 2014 proof of loss letter to ART from Claimants' counsel at the time,[] Mr. Palmer informed Mr. Stewart that the insured had formally submitted a claim for payment under the Policy.

3.      Within a week of the 22 June 2015 and 15 July 2015 letters from Vantage's current counsel to ART, Mr. Palmer informed Mr. Stewart that, following ART's determination that Vantage had failed to satisfy the MCL requirement in the Policy,[] Vantage had advised that it would pursue arbitration to press its claim.

•    In addition, ART confirms that in December 2015, Mr. Stewart and/or Ben Bradbury of Willis provided an update on the status of the dispute to Hannover in connection with the renewal of ART's reinsurance program, and noted that Vantage continued to pursue its claim.

125.    Vantage served Requests for Admission during the Arbitration concerning the availability of the reinsurance to pay an arbitration award.  One of Vantage's Requests for Admission asked ART PCC to admit that it "has not notified the reinsurers to whom the risk under the Insurance Policy was ceded of the Claim."  In its responses, dated July 1, 2016, which were signed by signed by its counsel, ART PCC denied the request and again confirmed that "ART [PCC] has notified the reinsurers of Vantage's claim and the ensuing dispute, including this arbitration, though communications between Mr. Palmer and Willis, in its capacity as reinsurance broker."  A copy of ART PCC's Responses and Objections to Claimant's First Set of Requests for Admissions is attached as Exhibit 17.

200367.00002/105837992v.4

**Paul Palmer's Deposition**

126.    Mr. Palmer's deposition during the Arbitration was on July 15, 2016.  During his

deposition, at which he was represented by Debevoise & Plimpton, Mr. Palmer testified that he

notified Reinsurer Defendants of Vantage's claim and kept Reinsurer Defendants apprised of

developments relating thereto through Mr. Stewart and Willis.  For example, Mr. Palmer

testified that he communicated regularly with Mr. Stewart and that he advised Mr. Stewart of

the November 2013 Notice of Default within a week of receiving it, that he advised Mr. Stewart

of the November 19, 2014 Proof of Loss within a day or two of receiving it, and that he notified

Mr. Stewart of Vantage's June 22, 2015 letter within a week of receiving it.  In addition, Mr.

Palmer testified that he advised Mr. Stewart in connection with the renewal of the Reinsurance

Agreements in December 2015 that the Arbitration was ongoing.

127.    Mr. Palmer testified that it was Mr. Stewart and Willis's duty to communicate

with Reinsurer Defendants.

128.    Mr. Palmer also testified at his deposition that he dealt "frequent[ly]" with Willis

Management, which was responsible for the "day to day operations" of ART PCC.  Mr. Palmer

confirmed that he made Mr. Guerino aware of Vantage's claim for coverage under the Credit

Insurance Policy at "various points" after November 2013.

129.    Mr. Palmer also testified during his deposition that ART PCC had sold insurance

policies to other insureds.

**Arbitration Award**

130.    During the Arbitration, Vantage and ART PCC each moved for summary

judgment.

30

131.    The arbitrators issued the Interim Award dated November 14, 2016.  The Interim

Award, which was unanimous, granted Vantage's motion for summary judgement and denied

ART PCC's motion for summary judgment.  The Interim Award awarded Vantage the amount

of its claim under the Credit Insurance Policy plus prejudgment interest as well as the costs of

the arbitration (but not the costs of legal representation).  The Interim Panel directed that

Vantage and ART PCC to meet and confer on the dollar amount of the final award.  A true and

correct copy of the Interim Award is attached hereto as Exhibit 18.

132.    Mr. Palmer notified Mr. Stewart about the Interim Award by e-mail dated

November 18, 2016.  Mr. Stewart responded by e-mail dated November 22, 2016, stating that

Willis Limited would "remind the brokered panel and feedback their responses."  Mr. Stewart's

e-mail also noted that the brokered panel of reinsurers would no doubt want to know

Hannover's position and he asked Mr. Palmer to keep Willis "posted."

133.    On information and belief, by letter dated November 13, 2016, Reinsurer

Defendants advised ART PCC that they were reserving their rights with respect to any claim or

demand that ART PCC might make under the Reinsurance Agreements, including the right to

deny coverage for any such claim.

134.    As directed by the Interim Award, Vantage's counsel advised ART PCC's

counsel of the dollar amount of the award that Vantage expected ART PCC to pay and

instructed ART PCC to take steps to preserve all assets.  In response, ART PCC's counsel

advised Vantage that the reinsurance and a $2,200,000 letter of credit issued by Vantage to the

D.C. Department of Insurance, Securities and Banking "are the only funds available" to pay

Vantage's losses under the Credit Insurance Policy.  As the letter of credit, which was provided

by Vantage, was not intended to pay Vantage's losses, ART PCC was representing that the Reinsurance Agreements were the only assets available to pay Vantage's loss.

135.    ART PCC's counsel also confirmed that ART PCC advised Reinsurer Defendants of the Interim Award and "undertook to keep them apprised of any developments going forward – and will continue to do so." A copy of ART PCC's December 9, 2016 letter is attached hereto as Exhibit 19.

136.    The arbitrators issued the Final Award dated December 30, 2016.  Like the Interim Award, the Final Award granted Vantage's motion for summary judgment and denied ART PCC's motion for summary judgment.  The Final Award awarded Vantage "$22,000,000 under Policy No TCXXXX/001, plus prejudgment interest of $3,439,450 ($5425 per day from April 6, 2015, to December 30 2016), plus $74,587.50 costs of arbitration, for a total of $25,514,037.50."

137.    On information and belief, ART PCC notified Reinsurer Defendants of the Final Award.

## Reinsurer Defendants' Coverage Denial

138.    By letter dated May 12, 2017, counsel for Reinsurer Defendants notified ART PCC that they were denying coverage under the Reinsurance Agreements for the Arbitration Award and Judgment.  A true and correct copy of Reinsurer Defendants' May 12, 2017 letter is attached hereto as Exhibit 20.

139.    As the sole basis for Reinsurer Defendants' denial of coverage, Reinsurer Defendants alleged that ART PCC and Willis had failed to provide them with information about Vantage's loss arising out the Glacial transaction.

140.    Reinsurer Defendants' May 12, 2017 letter denied the assertions that ART PCC, it counsel, and Mr. Palmer made throughout the Arbitration that Reinsurer Defendants had been advised of Vantage's loss:

> Contrary to ART's representations to the panel in the arbitration with Vantage, Reinsurers did not receive advice of the following:
>
> - The outcome of the Bankruptcy Proceeding, including but not limited to the fact that despite a Vantage recovery in excess of $60 million, no recovery was allocated to Vantage's "agreed and secured" Pre-Petition claim.
>
> - Vantage's November 19, 2014 Proof of Loss to the Ceded Policy.
>
> - ART's denial of coverage under the Ceded Policy, including the April 6, 2015 "formal" denial of coverage.
>
> - The correspondence between counsel for Vantage and ART in June and July 2015 regarding arbitration and acknowledging the commencement of arbitration proceedings.
>
> - Vantage's November 10, 2015 "Notice of Arbitration" and ART's December 2, 2015 "Notice of Defense".
>
> - The developments in the arbitration that culminated in the November 16, 2016 Interim Award against ART.

141.    Reinsurer Defendants' May 12, 2017 letter alleged that ART PCC's and Willis' failure to provide them with information about Vantage's loss breached Article XV, paragraph A and paragraph B, of the Reinsurance Agreements.

142.    Reinsurer Defendants' May 12, 2017 letter alleged that the Reinsurer Defendants did not receive notification of Vantage's loss or Vantage's Proof of Loss until November 18, 2016.  According to the Reinsurer Defendants' letter, Vantage's loss was determined in the bankruptcy proceedings "in or about mid-2014."  As a result, Reinsurer Defendants stated, ART PCC's November 2016 correspondence "can, in no way, be considered 'Prompt Notice of Loss.'"

143.     Contrary to these assertions, Reinsurer Defendants had received and conceded notice of Vantage's claim at the time of the Notice of Default to Glacial, throughout the pendency of the Glacial bankruptcy, and during the December 2015 reinsurance renewal communications with ART PCC and Mr. Palmer.

144.     Reinsurer Defendants nonetheless alleged that ART PCC failed to advise them of developments in the Glacial bankruptcy proceedings, the outcome of the bankruptcy, the Vantage Proof of Loss, the denial of Vantage's claim, the demand for arbitration, and developments in the arbitration prior to the issuance of the Interim Award.

145.     Reinsurer Defendants also alleged that, to the extent ART PCC contends that it provided verbal or written notice to Willis of the Loss, Proof of Loss, demand for arbitration or any other developments concerning the Vantage claim in satisfaction of its obligations under Article XV, there had been no response to their requests for documentation reflecting "verbal or written notice to Willis of Loss, Proof of Loss, demand for arbitration or any other developments concerning the Vantage claim in satisfaction of its obligations under Article XV."

146.     Reinsurer Defendants also asserted that Willis has not been able to confirm that it provided communications to Reinsurer Defendants concerning the loss, the Proof of Loss, demand for arbitration or developments concerning the Vantage claim.  Reinsurer Defendants also contended that even if Willis was advised of the requested information, "it was never disseminated to Reinsurers."

147.     Reinsurer Defendants also contended that ART PCC breached Paragraph B of Article XV in the Reinsurance Agreements, contending that "at no time prior to [ART PCC's November 18, 2016 correspondence] did ART afford Reinsurers an opportunity to associate in the defense or control of the Vantage claim."

200367.00002/105837992v.4

148.    Based on the alleged grounds in the May 12, 2017 letter, Reinsurer Defendants contended that, "if a claim for payment is presented to them in connection with the arbitration award and the judgment arising therefrom, either by ART or Vantage, or any other entity claiming to derive rights from ART under the Reinsurance Agreements, it will be denied . . . ."

149.    Vantage responded to Reinsurer Defendants' letter via letter dated May 15, 2017, explaining that in June and July 2015, Willis – the intermediary under the Reinsurance Agreements – was copied on correspondence in which Vantage outlined its claim against ART PCC (including references to the correspondence related to the Proof of Loss and the Arbitration.  Vantage also pointed out that Reinsurer Defendants designated Mr. Palmer as their Key Man and that Reinsurer Defendants could not deprive Vantage of the benefits of the insurance it purchased by citing to the purported failures of their own "Key Man."  A true and correct copy of Vantage's May 15, 2017 letter is attached hereto as Exhibit 21.

150.    By letter dated June 5, 2017, Reinsurer Defendants responded to Vantage's letter, reasserting the positions from their May 12, 2017 letter.  Even more disturbingly, Reinsurer Defendants questioned Vantage's right to even challenge Reinsurer Defendants' coverage denial, asserting that "Vantage is not a party to the Reinsurance Agreements," that Reinsurer Defendants "do not believe that Vantage has a contractual right to assert a payment demand against the Reinsurers," and that Reinsurer Defendants "question Vantage's standing to challenge [their] positions."  A true and correct copy of Reinsurer Defendants June 5, 2017 letter is attached hereto as Exhibit 22.

## COUNT I
## BREACH OF CONTRACT
### (Against Reinsurer Defendants)

151.    Vantage repeats and realleges each and every allegation as if fully set forth at length herein.

35

152.     Reinsurer Defendants entered into valid and binding contractual agreements to pay Vantage for losses suffered by Vantage covered by the Credit Insurance Agreement.

153.     Reinsurer Defendants breached these agreements by refusing to provide coverage for the Vantage's losses, the Arbitration Award, or the Judgment.

154.     As a direct and proximate cause of Reinsurer Defendants' breach of the agreements, Vantage has suffered damages in the amount of the Judgment or in such greater amount to be proven at trial, plus costs and interests thereon.

**COUNT II**
**DECLARATORY JUDGMENT**
**(Against Reinsurer Defendants and ART PCC)**

155.     Vantage repeats and realleges each and every allegation as if fully set forth at length herein.

156.     Reinsurer Defendants entered into valid and binding contractual agreements to pay Vantage for losses suffered by Vantage covered by the Credit Insurance Agreement.

157.     The Arbitration Award and the resulting Judgment establish ART PCC's liability under the Credit Insurance Policy.

158.     Reinsurer Defendants have asserted that they will deny any claim or demand for payment by ART PCC or Vantage in connection with the Arbitration Award and the Judgment.

159.     An actual and justiciable controversy exists with respect to the duty of Reinsurer Defendants to provide indemnity in connection with the Arbitration Award and the Judgment and whether Reinsurer Defendants are estopped from relying on the conduct of their own Key Man and intermediary to deny coverage.

160.     ART PCC is an interested party to the requested declaratory relief, and is included as a party to this count for declaratory relief.

200367.00002/105837992v.4

161.    Declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

162.    Pursuant to 28 U.S.C. § 2201, Vantage seeks a declaration by this Court of the rights of Vantage and the obligations of Reinsurer Defendants under the contractual agreements to pay Vantage for losses with respect to Vantage's loss arising out of the Glacial transaction, the Arbitration Award, and the Judgment.

**COUNT III**
**NEGLIGENCE**
**(Against Willis Limited, Willis Re, and Willis Management)**

163.    Vantage repeats and realleges each and every allegation as if fully set forth at length herein.

164.    Willis Limited, Willis Re, and Willis Management in the course of providing reinsurance and captive management services to ART PCC, agreed to advise ART PCC on the procurement and maintenance of reinsurance to provide financial support for the Credit Insurance Policy, to act as intermediaries under the Reinsurance Agreements, and to manage ART PCC, for Vantage's benefit.  Because such services were intended for Vantage's benefit, Willis Limited, Willis Re, and Willis Management each owed a duty of care to Vantage to provide such reinsurance and captive management services with the reasonable care that a reasonable person would have exercised under similar circumstances.

165.    Willis Limited, Willis Re, and Willis Management failed to use the reasonable care that a reasonable person would have exercised under similar circumstances by, among other things:

- Failing to request from ART PCC and convey sufficient and timely information about Vantage's loss arising from the Glacial transaction, its claim for insurance, and the Arbitration to Reinsurer Defendants;

37

- Failing to advise ART PCC of the necessity to preserve the availability of coverage under the Reinsurance Agreements to pay losses covered under the Credit Insurance Policy;

- Failing to disclose and misrepresenting to Vantage that coverage under the Reinsurance Agreements would not be available to compensate Vantage in the event it suffered a loss covered under the Credit Insurance Policy; and

- Misrepresenting to Vantage that the reinsurance backing the Credit Insurance Policy would be "ceded on the same terms, conditions and settlements as the original policy" and failing to disclose to Vantage that the Reinsurance Agreements contained terms and provisions not found in the Credit Insurance Policy.

166.    As a direct and proximate cause of Willis Limited's, Willis Re's, and Willis Management's negligence, Vantage has suffered damages in the amount of the Judgment or in such greater amount to be proven at trial, plus costs and interests thereon.

## COUNT IV
## PROFESSIONAL NEGLIGENCE
### (Against Willis Limited, Willis Re, and Willis Management)

167.    Vantage repeats and realleges each and every allegation as if fully set forth at length herein.

168.    Throughout the course of dealings with ART PCC, Willis Limited, Willis Re, and Willis Management held themselves out as skilled reinsurance advisors, reinsurance brokers, reinsurance intermediaries, and captive managers, having superior knowledge and skill regarding their ability to provide reinsurance and captive management services.

169.    Willis Limited, Willis Re, and Willis Management in the course of providing reinsurance and captive management services to ART PCC, undertook and agreed to advise

38

ART PCC on the procurement and maintenance of reinsurance to provide financial support for the Credit Insurance Policy, to act as intermediaries under the Reinsurance Agreements, and to manage ART PCC, for Vantage's benefit.  Because such services were intended for Vantage's benefit, Willis Limited, Willis Re, and Willis Management each owed a duty of care to Vantage to provide such reinsurance and captive management services with reasonable skill and ordinary diligence that a reinsurance advisor, reinsurance broker, reinsurance intermediary and captive manager would have used under similar circumstances.

170.    Willis Limited, Willis Re, and Willis Management failed to use the skill and diligence that a reasonably careful reinsurance advisor, reinsurance broker, reinsurance intermediary or captive manager would have used in similar circumstances by, among other things:

- Failing to request from ART PCC and to convey sufficient and timely information about Vantage's loss arising from the Glacial transaction, its claim for insurance, and the Arbitration to Reinsurer Defendants;

- Failing to advise ART PCC on the necessity to preserve the availability of coverage under the Reinsurance Agreements to pay losses covered under the Credit Insurance Policy;

- Failing to disclose and misrepresenting to Vantage that coverage under the Reinsurance Agreements would not be available to compensate Vantage in the event it suffered a loss covered under the Credit Insurance Policy;

- Misrepresenting to Vantage that the reinsurance backing the Credit Insurance Policy would be "ceded on the same terms, conditions and settlements as the original policy"

and failing to disclose to Vantage that the Reinsurance Agreements contained terms and provisions not found in the Credit Insurance Policy.

171.    As a direct and proximate cause of Willis Limited's, Willis Re's, and Willis Management's negligence, Vantage has suffered damages in the amount of the Judgment or in such greater amount to be proven at trial, plus costs and interests thereon.

**COUNT V**
**BREACH OF CONTRACT**
**(Against Willis Limited, Willis Re, and Willis Management)**

172.    Vantage repeats and realleges each and every allegation as if fully set forth at length herein.

173.    Willis Limited, Willis Re, and Willis Management entered into valid and binding contractual agreements to convey timely and sufficient information regarding Vantage's loss from the Glacial transaction to Reinsurer Defendants.

174.    Willis Limited, Willis Re, and Willis Management breached these agreements by failing to provide timely and sufficient information regarding Vantage's loss from the Glacial transaction to Reinsurer Defendants.

175.    As a direct and proximate cause of Willis Limited's, Willis Re's, and Willis Management's breach of the agreements, Vantage has suffered damages in the amount of the Judgment or in such greater amount to be proven at trial, plus costs and interests thereon.

**COUNT VI**
**NEGLIGENT UNDERTAKING**
**(Against Willis Limited, Willis Re, and Willis Management)**

176.    Vantage repeats and realleges each and every allegation as if fully set forth at length herein.

40

177.    Willis Limited, Willis Re, and Willis Management in the course of providing reinsurance and captive management services to ART PCC, agreed to advise ART PCC on the procurement and maintenance of reinsurance to provide financial support for the Credit Insurance Policy, to act as intermediaries under the Reinsurance Agreements, and to manage ART PCC.

178.    In so doing, Willis Limited, Willis Re, and Willis Management each owed a duty to Vantage to provide such reinsurance and captive management services with the reasonable care that a reasonable person would have exercised under similar circumstances because they should have recognized that the foregoing services were necessary for the protection of Vantage and its ability to recover insurance benefits under the Credit Insurance Policy.

179.    Willis Limited, Willis Re, and Willis Management failed to use the reasonable care that a reasonable person would have exercised under similar circumstances by, among other things:

- Failing to request from ART PCC and convey sufficient and timely information about Vantage's loss arising from the Glacial transaction, its claim for insurance, and the Arbitration to Reinsurer Defendants;

- Failing to advise ART PCC of the necessity to preserve the availability of coverage under the Reinsurance Agreements to pay losses covered under the Credit Insurance Policy;

- Failing to disclose and misrepresenting to Vantage that coverage under the Reinsurance Agreements would not be available to compensate Vantage in the event it suffered a loss covered under the Credit Insurance Policy; and

- Misrepresenting to Vantage that the reinsurance backing the Credit Insurance Policy would be "ceded on the same terms, conditions and settlements as the original policy" and failing to disclose to Vantage that the Reinsurance Agreements contained terms and provisions not found in the Credit Insurance Policy.

180.    Willis Limited's, Willis Re's, and Willis Management's negligent performance of its duties, which included duties that ART PCC owed to Vantage, increased the risk of harm and did cause harm to Vantage's ability to recover policy benefits under the Credit Insurance Policy. In addition, Vantage relied on Willis Limited, Willis Re, and Willis Management to perform the duties they undertook non-negligently.

181.    As a direct and proximate cause of Willis Limited's, Willis Re's, and Willis Management's negligence, Vantage has suffered damages in the amount of the Judgment or in such greater amount to be proven at trial, plus costs and interests thereon.

### COUNT VII
### NEGLIGENT MISREPRESENTATION
#### (Against Willis Limited, Willis Re, and Willis Management)

182.    Vantage repeats and realleges each and every allegation as if fully set forth at length herein.

183.    Willis Management, Willis Limited, and Willis Re made misrepresentations of fact and omissions to Vantage concerning the reinsurance intended to back the Credit Insurance Policy, by, among other things:

- Failing to disclose and misrepresenting to Vantage that coverage under the Reinsurance Agreements would not be available to compensate Vantage in the event it suffered a loss covered under the Credit Insurance Policy;

200367.00002/105837992v.4

- Misrepresenting to Vantage that the reinsurance backing the Credit Insurance Policy would be "ceded on the same terms, conditions and settlements as the original policy" and failing to disclose to Vantage that the Reinsurance Agreements contained terms and provisions not found in the Credit Insurance Policy; and

- Failing to disclose that Willis Management, Willis Limited, and Willis Re would not convey information regarding Vantage's loss from the Glacial transaction to Reinsurer Defendants.

184.    Willis Management, Willis Limited, and Willis Re each had a duty to disclose to Vantage that the reinsurance would not be available to pay claims covered under the Credit Insurance Policy, that the Reinsurance Agreements contained terms that were contrary to the representation in the Credit Insurance Binders that reinsurance would be "ceded on the same terms, conditions and settlements as the original policy," including that the reinsurance purported to limit Vantage's ability to enforce the Reinsurance Agreements and the arbitration provision.  They also had a duty to disclose that they would not convey information concerning Vantage's loss to Reinsurer Defendants.

185.    The representations and omissions of Willis Management, Willis Limited, and Willis Re were material to whether sufficient funds would be available to pay Vantage's losses under the Credit Insurance Policy and to Vantage's ability to enforce the Reinsurance Agreements.

186.    Vantage reasonably relied to its detriment upon the false statement and omissions of Willis Management, Willis Re, and Willis Limited to its determent.  Had Vantage known that reinsurance would not be available to pay losses covered under the Credit Insurance Policy or that the Reinsurance Agreements contained provisions purporting to limit its rights to enforce

200367.00002/105837992v.4

the agreements, Vantage would have taken alternative actions to manage its risk arising from the Glacial transaction, and/or provided information to Reinsurer Defendants.

187. As a direct and proximate cause of Willis Management's, Willis Re's and Willis Limited's actions, Vantage has suffered damages in the amount of the Judgment or in such greater amount to be proven at trial, plus costs and interests thereon.

## PRAYER FOR RELIEF

WHEREFORE, Vantage prays for judgment as follows:

1. That Defendants are liable to Vantage for damages, to be proven at trial but currently estimated to be in excess of $26 million and legal interest on the judgment plus the attorneys' fees and costs for all actions undertaken in collection of the judgment;

2. That the Court declare the rights of Vantage and the obligations of Reinsurer Defendants with respect to Vantage's loss arising out of the Glacial transaction, the Arbitration Award, and the Judgment;

3. That the Court award Vantage such other and further relief as the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Vantage hereby demands a trial by jury on all issues so triable.

200367.00002/105837992v.4

Dated:  July 20, 2017                     Respectfully submitted,

                                          BLANK ROME LLP

                         By:    /s/ John A. Gibbons
                                John A. Gibbons
                                D.C. Bar No. 474951
                                JGibbons@BlankRome.com
                                1825 Eye Street, N.W.
                                Washington, DC  20006-5403
                                Tel:  (202) 420-2200
                                Fax: (202) 420-2201
                                *Counsel of Record*

                                James S. Carter
                                D.C. Bar No. 479432
                                JSCarter@BlankRome.com
                                1825 Eye Street, N.W.
                                Washington, DC  20006-5403
                                Tel:  (202) 420-2200
                                Fax: (202) 420-2201
                                *Application for Admission Pending*


                                ***Attorneys for Plaintiff Vantage Commodities
                                Financial Services I, LLC***

45