**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **VANTAGE COMMODITIES FINANCIAL SERVICES I, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**WILLIS LIMITED,[1] *et al.*,**<br><br>Defendants. | Case No. 1:17-cv-01451 (TNM) |

## MEMORANDUM OPINION

In this sprawling insurance coverage dispute, Plaintiff Vantage Commodities Financial Services I, LLC ("Vantage") complains that when the music stopped it was left holding the bag. And the bag had a $22 million hole in it. That much may be true. But Vantage now points the finger at ten reinsurers and insurance brokers that it blames for its misfortune.[2] The Court cannot agree that any of these entities are liable for Vantage's losses.

In the parties' cross-motions for summary judgment, the Court must determine whether three insurance brokers negligently breached alleged duties to Vantage. The Court must also decide whether various reinsurers owe Vantage under an implied-in-fact contract, or, in the

---

[1] The named Defendant was Assured Risk Transfer PCC, LLC, but the Court dismissed it from the case. *See* Mem. Order (Nov. 16, 2018) at 12, ECF No. 85.

[2] These "Reinsurers" are Defendants Hannover Ruckvericherung AG ("Hannover Re"), Partner Reinsurance Europe PLC ("Partner Re"), and Caisse Centrale de Reassurance SA ("CCR") (collectively, the "Continental Reinsurers"), as well as Defendants/Counterclaim-Plaintiffs Syndicate 4472 (a/k/a Liberty Syndicates), Syndicate 2001 (a/k/a MS Amlin), Syndicate 1206 (a/k/a Am Trust), and Catlin Re Switzerland (Catlin Re), (collectively, the "Lloyd's/Catlin Reinsurers"). The insurance brokers are Defendants Willis Towers Watson Management (Vermont) Limited ("Willis Vermont"), Willis Limited ("Willis London"), and Willis Re, Inc. (collectively, "Willis Defendants").

alternative, under the doctrines of promissory estoppel or unjust enrichment.  Lastly, one group of reinsurers counterclaims that Vantage tortiously interfered with their reinsurance agreement.  For the following reasons, the Court will grant summary judgment to the Willis Defendants and the Reinsurers, except as to the tortious interference counterclaim.  It will grant summary judgment to Vantage on the counterclaim but otherwise deny its cross-motion.

## I.  BACKGROUND

### A.  The Facts

Like all good insurance disputes, this case begins with a calculated risk.  EDF Trading North America, LLC ("EDF") is a global utility wholesaler.  EDF signed an agreement with an energy service company, Glacial Energy Holdings ("Glacial"), under which Glacial agreed to purchase natural gas and electricity from EDF for resale.  *See* Lloyd's/Catlin Reinsurers' Mot. for Partial Summ. J. ("Catlin Mot.") Ex. 29, ECF 140-29.[3]  Typical for its industry, Glacial had trouble obtaining financing for the deal from conventional sources of credit.  *See* Catlin Mot. Ex. 24 at 22–23, ECF 140-24.  EDF formed Vantage as a credit vehicle to provide financing to customers such as Glacial.  Catlin Mot. Ex. 19 at 16–17, 20, ECF 140-19.  Vantage signed a loan agreement with Glacial, extending "credit support . . . in the form of cash, letter of credit, bonds or guarantees."  Catlin Mot. Ex. 147 at 3, ECF 140-147.

Now on the hook for millions of dollars, Vantage sought to "syndicate some of the risk" of Glacial defaulting—that is, it wanted to bring in third parties to assume some potential liabilities in exchange for some of the incremental profits.  Catlin Mot. Ex. 25 at 8, ECF 140-25.  For this "risk offtake" strategy, Vantage turned to Equifin Risk Solutions, LLC ("ERS") and its

---

[3]  All exhibit numbers refer to the numbered attachments to the CM/ECF filings, not the title of any documents.  All page citations refer to the pagination generated by the Court's CM/ECF system.

president Paul Palmer, a veteran of the insurance industry known for designing creative financing deals.  Catlin Mot. Ex. 19 at 22, ECF No. 140-19; *see also id.* at 18–19, 21–25. Vantage retained ERS to create a special-purpose "captive" insurance entity known as a Protected Cell Company ("PCC"), which would then be backed by reinsurance.  *Id.* at 25; *see also* Pl. Vantage's Statement of Undisputed Material Facts in Supp. of its Cross Mot. for Partial Summ. J. ("Vantage SUMF") at 2, ECF No. 144-2.  The Engagement Letter between ERS and Vantage states that ERS's duties included "designing and establishing the Captive," "sourcing and managing the reinsurance capital" to back the Captive, and "managing all aspects of the Captive's activities, including its . . . relationship with . . . the reinsurer base."  Catlin Mot. Ex. 44 at 3, ECF No. 140-44 (cleaned up); *see also* Catlin Mot. Ex. 24 at 31–32, ECF No. 140-24.

Captive insurers must retain certain licensed service providers, such as auditors and managers.  D.C. Code § 31-3931.11(c).  For its special purpose insurance manager, ERS retained Willis Vermont.  *See* Lloyd's/Catlin Reinsurers' Statement of Undisputed Material Facts ("Catlin SUMF") ¶¶ 20–21, ECF No. 140-2; Vantage SUMF ¶¶ 76–77.  ERS agreed to pay Willis Vermont a one-time fee of $30,000 for "formation" services including licensing "associated with formation of a single corporate Protected Cell Company ('PCC') entity . . . owned by [ERS]." Catlin Mot. Ex. 33 at 3, ECF No. 140-33.  It also agreed to a $25,000 annual fee for management services.  *Id.* at 4.  According to Palmer, these services included handling "day to day operations, m[eeting] whatever regulatory requirements there were, accounting, all that stuff."  Catlin Mot. Ex. 174 at 11, ECF No. 140-174.

With Willis Vermont as manager, ERS applied to the D.C. insurance authorities to create and license Vantage Re PCC, LLC ("Vantage Re").  *See* Catlin Mot. Ex. 34, ECF No. 140-34. The application explained that Vantage Re would insure Vantage up to $22 million—with

Vantage Re planning to retain 10 percent of the risk and reinsure the remaining amount ($19.8 million).[4]  *Id.* at 12, 15.  But while financing Vantage served as the impetus for creating the captive insurer, Palmer had planned to use it insure other entities as well.  Catlin Mot. Ex. 24 at 31–32, ECF No. 140-24.  The application to the D.C. Department of Insurance confirmed this.  *See* Catlin Mot. Ex. 34 at 15, ECF No. 140-34.  Palmer later changed the name of Vantage Re to Assured Risk Transfer PCC, LLC in 2014 in accordance with a reorganization at ERS.  Catlin Mot. Ex. 116 at 2, ECF No. 140-116.  For ease of reference, the Court will call the entity "ART."

Once ART received its license in spring 2012, *see* Catlin Mot. Ex. 37, ECF No. 140-37, Palmer began sourcing reinsurers in earnest.  He informed would-be reinsurers about ART's planned policy with Vantage, but he pitched them on a reinsurance treaty under which they would reinsure a proportionate share of *multiple* policies issued by ART.  *See* Catlin SUMF ¶¶ 34–40; Catlin Mot. Ex. 41 at 5–8, ECF No. 140-41; Catlin Mot. Ex. 43 at 11, ECF No. 140-43; *see also N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1199 (3d Cir. 1995) (explaining and distinguishing reinsurance treaties).  Palmer's marketing materials also explained that "[a]ll customer activity, including claims, will be handled by Vantage Re" (n/k/a ART).  Catlin Mot. Ex. 43 at 10, ECF No. 140-43.[5]

---

[4]  This was the minimum amount of liability that Vantage Re could retain, as D.C. regulations required that captive insurers maintain 10 percent.  Vantage covered this amount for Vantage Re by issuing it a $2.2 million Letter of Credit that it filed with the D.C. insurance authorities.  *See* Catlin Mot. Ex. 70, ECF No. 140-70.

[5]  The parties disagree vehemently whether (and when) the reinsurers knew ART had insufficient funds to cover Glacial's default on its own—i.e., without reinsurance.  *See, e.g.*, Mem. in Support of  Lloyd's/Catlin Reinsurers' Mot. for Partial Summ. J. ("Catlin Mem.") Ex. 29 at 42–43, ECF No. 140-1; Vantage's Reply in Support of Pl.'s Cross-Mot. for Partial Summ. J. ("Vantage Reply") at 7–8, ECF 158.  Based on the Court's other findings, the answer is immaterial.  So the Court need not determine whether there can be any dispute about what the Reinsurers (collectively or individually) knew about ART's capitalization when they signed the Reinsurance Agreements.

By December 2012, Palmer secured commitments from several established reinsurers: Hannover Re, Partner Re, and Allied World Assurance Company ("Allied World").  With Hannover leading, they agreed to reinsure ART for $19.8 million—90 percent of the $22 million in coverage that ART planned to issue to Vantage.  Catlin SUMF ¶¶ 43–47.  Hannover Re and Partner Re each provided ERS with a Reinsurance Placement Slip that confirmed their commitment.  Both documents outlined the basic parameters of the proposed reinsurance treaty. They stated that the reinsurance would be on the "same terms, conditions and settlements as original," refencing the yet-to-be-issued policy between ART and Vantage.  Catlin Mot. Ex. 46 at 7, Ex. 52 at 8, ECF Nos. 140-46, 140-52.  Palmer had also tried to sign up Catlin Re as a reinsurer, but the deal fell apart during negotiations with its representative, Martin Hochstrasser. Catlin SUMF ¶ 49.

Meanwhile, the ubiquitous Palmer was also negotiating with Vantage over the primary insurance contract that ART would issue to it.  Palmer asked Willis Vermont to draft a Credit Insurance Binder ("2012 Binder") outlining the terms for presentation to Vantage.  *Id.* ¶ 57. Like a term sheet, these binders are common in the insurance industry and permit parties to agree on the major terms of a deal while still reserving the ability to hammer out the minor and more complicated details.[6]  Among other edits to the one-page binder, Palmer added:  "Reinsurance is ceded on the same terms, conditions and settlements as the original policy."  Catlin Mot. Ex. 67

---

[6]  Temporary insurance coverage continues under a binder's terms until the parties set or refuse a final policy.  *Burlington Ins. Co. v. Okie Dokie, Inc.*, 398 F. Supp. 2d 147, 157 (D.D.C. 2005) ("A binder is a preliminary arrangement that provides temporary protection for the insured until the insurer issues a formal policy."); *see also Emps. Com. Union Ins. Co. v. Firemen's Fund Ins. Co.*, 45 N.Y.2d 608, 612–13 (N.Y. 1978) ("It is a common and necessary practice in the world of insurance, where speed often is of the essence, for the agent to use this quick and informal device [a binder] to record the giving of protection *pending the execution and delivery of a more conventionally detailed policy of insurance.*") (emphasis added).

at 16, ECF No. 140-67.  Willis Vermont's COO signed the final 2012 Binder after Palmer, on

behalf of ART, authorized him to do so, and then Palmer sent it to Vantage.[7]  Catlin SUMF

¶¶ 60–62; Vantage Mot. Ex. 56, ECF No. 144-56.

Palmer later sent the 2012 Binder to Hannover Re and Partner Re.  Vantage SUMF ¶ 41.

Representatives from both carriers confirmed receipt and that the binder accurately reflected the

amount of coverage.  *Id.*  Neither company ever passed the 2012 Binder along to any other

reinsurers.  *See* Catlin SUMF ¶¶ 68–74.

ART issued the Credit Insurance Policy ("Credit Policy") to Vantage effective January

2013, insuring Vantage for up to $22 million for one year against any nonpayment or losses from

lending to an energy service company (such as Glacial).  Catlin SUMF ¶¶ 97–98; Vantage

SUMF ¶ 4.  The policy does not mention reinsurance or the existence of any third-party insurers.

Catlin Mot. Ex. 71, ECF No. 140-71.  Vantage had requested that the policy mention the

Reinsurance Placement Slips but Palmer demurred, explaining that the request "made no sense at

all."  Catlin Mot. Ex. 69 at 2, ECF No. 140-69.  Once the deal went live, Vantage started paying

quarterly premiums to ART, which then remitted payments to the Reinsurers through Willis

Vermont and Willis London.  Vantage SUMF ¶ 52; Catlin SUMF ¶¶ 168–73; Catlin Mot. Ex. 27

at 24–25, ECF No. 140-27.

Despite commitments from the two reinsurers via the Reinsurance Placement Slips, the

reinsurance treaty between ART and the reinsurers had yet to be finalized.  Palmer's goal was for

the reinsurance treaty to "mirror" the terms of the Credit Policy.  Catlin Mot. Ex. 24 at 9–10,

---

[7]  A Willis representative initially resisted signing, stating in an email to Palmer that Willis
Vermont was "not authorized by the Board of" ART to sign.  Catlin Mot. Ex. 66 at 2, ECF No.
140-66.  Palmer explained that time was of the essence but his legal counsel had told him that he
could not sign the binder unless he was in Washington, D.C., which he was not, so he by email
"authoriz[ed] Willis Vermont to sign the binder on Vantage Re's behalf."  *Id.*

ECF No. 140-24.  Palmer negotiated with the two reinsurers—mainly with lead reinsurer Hannover Re—and according to him Willis Vermont was not involved.  *Id.* at 53.  ("Willis did not have anything to do with the Hannover negotiation.").  In February 2013, Hannover Re issued a reinsurance agreement ("Hannover Treaty") covering itself and Partner Re for 55 percent of the available reinsurer liability.  Catlin SUMF ¶¶ 110–11; Continental Reinsurers' Mot. for Summ. J. Ex. 1 ("Continental SUMF")s ¶ 42, ECF No. 142-1; *see also* Catlin Mot. Ex. 82 ("Hannover Treaty"), ECF No. 140-82.

After negotiations with Allied World fizzled, Palmer needed to find reinsurers to cover the remaining risk.  Through Willis Vermont he connected with Willis London, a related corporation with the same parent company but a different role in the industry.  Vantage SUMF ¶ 86; Catlin SUMF ¶¶ 112–21.  As a U.K.-based reinsurance intermediary, Willis London agreed to source reinsurers for ART on commission.  *Id.*  By mid-March 2013, Palmer secured an agreement from Catlin Re, and Willis London secured agreements from Liberty Syndicates, MS Amlin, Am Trust, and CCR.  *See* Catlin SUMF ¶¶ 124–36.  The reinsurers signed onto a Panel Reinsurance Agreement ("Panel Agreement") that was nearly identical to the Hannover Treaty, which remained the lead agreement.  *Id.* ¶ 137.  Unlike the Hannover Treaty, the Panel Agreement listed Willis London and Willis Re, Inc. as "intermediaries" between ART and the reinsurers.  *Id.* ¶ 138; Catlin Mot. Ex. 93 ("Panel Agreement") at 4, ECF No. 140-93.  Both reinsurance agreements have a "Key Man Clause" that lists Palmer as the named underwriter of ART and gives the Reinsurers the option to terminate or renegotiate the agreement if he were to leave ART.  Hannover Treaty at 18; Panel Agreement at 19.

Several months later, a private equity firm approached EDF about buying a portion of Vantage.  *See* Catlin Mot. Ex. 19 at 65–70, ECF No. 140-19.  As part of the due diligence

process, Vantage requested from Palmer a copy of the 2012 Binder.  *Id.*  Because the 2012 Binder stated that Allied World was a reinsurer and lacked a list of the new reinsurers, Palmer sent an updated version to Vantage.  This "2013 Binder" again included the electronic signature of the Willis Vermont COO and stated that "Reinsurance is ceded on the same terms, conditions and settlements as the original policy."  Catlin Mot. Ex. 101 at 3, ECF No. 140-101.  But it also stated that the "revised Binder is being issued for review/illustrative purposes only" and was "issue[d] by Vantage RE PCC, LLC" (n/k/a ART).  *Id.*  Palmer testified that he sent the binder "on behalf of ART . . . not the reinsurers" and never represented to Vantage that it came on their behalf.  Catlin Mot. Ex. 24 at 16, ECF No. 140-24.

## B.  The Dispute

In late 2013, and after several missed payments, Vantage sent a written notice to ART declaring that Glacial was in default.  Catlin Mot. Ex. 109, ECF No. 140-109.  Vantage's apparent loss was already well above the $22 million limit in the Credit Policy.  Catlin SUMF ¶ 187.  But Palmer concluded that Vantage's communication did not amount to a "claim" that would require formally notifying the Reinsurers under the Hannover Treaty and the Panel Agreement.  Catlin Mot. Ex. 24 at 66, ECF No. 140-24; *see also* Hannover Treaty at 10–11; Panel Agreement at 11.  Despite Palmer's confidence, Vantage submitted a claim to ART about a year later, seeking over $19 million.  Catlin Mot. Ex. 147 at 9, ECF No. 140-147.  Vantage sent the notice to ART with a copy to Palmer.  *Id.*  Vantage did not notify the Reinsurers or any Willis entity.  Catlin SUMF ¶¶ 223–32.

ART formally denied the claim in April 2015 because Vantage had failed to ensure that Glacial maintained certain minimum assets as collateral, as required by the Credit Policy.  *Id.* ¶ 233; *see* Catlin Mot. Ex. 71 at 11, ECF No. 140-71 ("Minimum Collateralization Level").

Palmer—and thus ART—did not notify the Reinsurers at this point because he believed that, under the Hannover Treaty and Panel Agreement, notification was not required until a claim was considered "valid."  Catlin Mot. Ex. 24 at 76–77, ECF No. 140-24; *see also* Hannover Treaty at 10–11; Panel Agreement at 11.  In June 2015, counsel for Vantage sent ART a letter, copying Willis Vermont, that reiterated Vantage's demand for payment, asked ART to "advise the reinsurers of the Loss and the reinsurers' obligation to pay the reinsured claim," and threatened arbitration.  Vantage Mot. Ex. 71 at 2–3, ECF No. 144-71.  Palmer still failed to notify the Reinsurers.  Catlin SUMF ¶¶ 253–59.

The disputed claim proceeded to arbitration, in which Vantage and ART were the only parties.  Catlin SUMF ¶ 237.  A three-member arbitration panel ruled against ART.  Vantage SUMF ¶ 113.  The New York State Supreme Court entered the panel's Final Award as a money judgment against ART for over $26 million, including $22 million under the Credit Policy plus interest and costs.  Catlin SUMF ¶¶ 271–72; *see* Catlin Mot. Ex. 189, ECF No. 140-189.  ART has not paid any of the money judgment.  Catlin SUMF ¶ 273.

Shortly after the arbitration panel's decision in November 2016, Palmer finally notified Willis London of the arbitration and forwarded the panel's initial award.  Continental SUMF ¶ 81; Catlin Mot. Ex. 178, ECF No. 140-178.  Willis London notified the reinsurers.  Catlin SUMF ¶ 264.  The Reinsurers eventually informed ART that they would deny any claim brought under the Hannover Treaty and Panel Agreement (collectively, "Reinsurance Agreements").  Continental SUMF ¶ 83; Catlin Mot. Ex. 191 at 5–13, ECF No. 140-191.  ART did not respond.  Catlin SUMF ¶ 270.

Then litigation began.  Vantage filed its initial Complaint here in July 2017.  Compl., ECF No. 1.  It sued ART, the Reinsurers, and the Willis Defendants.  *Id.* at 5–7.  Vantage raised

tort claims against the Willis Defendants for misrepresenting the substance and scope of the Credit Policy and Reinsurance Agreements and for failing to exercise due care in their management of ART.  *Id.* at 37–44.  As to the Reinsurers, Vantage alleged that they entered into binding contractual agreements to pay Vantage for any losses that it suffered under the Credit Policy.  *Id.* at 35–36.  For contractual language Vantage cited the Binders, which list the Reinsurers and the amount of Reinsurance that they agreed to provide.  *Id*. at 14.  Defendants all moved to dismiss.  *See* ECF Nos. 40, 42, 43, 44.

As the case progressed, counsel for Vantage and ART reached an "understanding," memorialized in an email.  Catlin Mot. Ex. 195 at 2, ECF No. 140-195.  On Vantage's claim against the Reinsurers, the parties concurred on "the responsibilities of the Reinsurers and Willis entities."  *Id.*  Vantage agreed to stop trying to enforce the money judgment against ART in New York, while ART agreed to withdraw its pending motion to dismiss this case and "submit an answer to Vantage's complaint asserting or admitting fact[] statements consistent with [Palmer's] deposition testimony" in the New York proceedings.  *Id.*  ART later withdrew its Motion to Dismiss, *see* ECF No. 68, and filed an Answer that admitted many facts appearing in Vantage's Complaint, *see* Answer at 3–16, ECF No. 67.

This Court granted motions to dismiss by the Reinsurers and Willis Defendants.  *See Vantage Commodities Fin. Servs. I, LLC v. Assured Risk Transfer PCC, LLC*, 321 F. Supp. 3d 49, 67 (D.D.C. 2018) ("*Vantage I*").  The Court permitted Vantage to amend its complaint and proceed on some counts, while dismissing others for failure to state a claim.  *See Vantage Commodities Fin. Servs. I, LLC v. Assured Risk Transfer PCC, LLC*, No. 1:17-CV-01451 (TNM), 2018 WL 6025774 (D.D.C. Nov. 16, 2018) ("*Vantage II*").  As to the Willis Defendants, the Court determined that Vantage failed to state a breach of contract claim but could proceed on

its claims of negligence, professional negligence, negligent undertaking, and negligent misrepresentation. *Vantage I*, 321 F. Supp. 3d at 61–65. As to the Reinsurers, the Court ruled that Vantage failed to state a claim for breach of contract based on the 2012 and 2013 Binders ("Binders") because though they "disclose the existence of the reinsurance policy and its terms . . . that description alone does not create a contractual relationship." *Vantage II*, 2018 WL 6025774, at *2. But the Court permitted Vantage's claims of breach of implied contract, promissory estoppel, and unjust enrichment to proceed. *Id.* at *3–5.[8] The Court dismissed ART from the case because Vantage ultimately sought no relief from it. *Id.* at *6.

In its Answer, the Lloyd's/Catlin Reinsurers alleged a counterclaim against Vantage for tortiously interfering with the Panel Agreement by inducing ART to breach the agreement in various ways. *See* Answer and Countercl. at 59–62, ECF No. 128. The Lloyd's/Catlin Reinsurers also began arbitration against ART on the terms of the Panel Agreement. Catlin SUMF ¶ 302. Lacking funds, ART did not participate, *id.* ¶¶ 304–11, but an appointed arbitrator represented ART's interests, *id.* ¶ 313. In July 2019, the arbitration panel determined that the Lloyd's/Catlin Reinsurers need not pay ART because ART did not give timely notice of the claim, prejudicing the Reinsurers. *Id.* ¶¶ 321–25; Catlin Mot. Ex. 205, ECF No. 140-205.

The parties now cross-move for summary judgment. The Reinsurers' main contention is that Vantage cannot show the existence of any implied contract between Vantage and the Reinsurers or establish liability under promissory estoppel or unjust enrichment. *See* Catlin

---

[8] On this point, the Court also denied the Reinsurers' subsequent motion for reconsideration. *Vantage Commodities Fin. Servs. I, LLC v. Assured Risk Transfer PCC, LLC*, No. 1:17-CV-01451 (TNM), 2019 WL 250125 (D.D.C. Jan. 17, 2019) ("*Vantage III*"). The Court later denied yet another motion to dismiss by the Reinsurers, as well denied as their requests to compel arbitration or stay this case pending the outcome of their arbitration against ART. *Vantage Commodities Fin. Servs. I, LLC v. Assured Risk Transfer PCC, LLC*, No. 1:17-CV-01451 (TNM), 2019 WL 1877097 (D.D.C. Apr. 26, 2019) ("*Vantage IV*").

Mem. at 22–52, ECF No. 140-1; Mem. of P. & A. in Supp. of Mot. for Summ. J. on Behalf of Continental Defs. ("Continental Mem.") at 10–50, ECF No. 142-2.  The Willis Defendants assert that they never owed any duties to Vantage and that recovery is barred by the "economic loss rule."  Willis Defs.' Mot. for Summ. J. ("Willis Mot.") at 28–57, ECF No. 141.

Vantage opposes summary judgment on these points but cross-moves for summary judgment on (1) the meaning of the phrase "same terms, conditions and settlements" as relevant to the dispute, (2) whether an implied-in-fact contract existed with the Reinsurers, and (3) whether the Willis Defendants owed it a duty of care.  Mem. of P. & A. in Supp. of Pl. Vantage's Cross Mot. for Summ J. ("Vantage Mem.") at 29–69, ECF No. 144-1.  Vantage also seeks summary judgment on the Lloyd's/Catlin Reinsurers' counterclaim for tortious interference.  *Id.* at 69–73.  Finally, the Lloyd's/Catlin Reinsurers seek leave to file a sur-reply, which Vantage opposes.  *See* ECF Nos. 159, 160, 162.  These motions are ripe.[9]

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When evidence conflicts, courts must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor."  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

---

[9]  This Court has subject matter jurisdiction under the diversity jurisdiction statute.  28 U.S.C. § 1332.  Oral argument would not aid the Court's resolution of this case, so it denies the various requests for a hearing.  *See* LCvR 78.1.

The moving party bears the initial burden of identifying those portions of the record that show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Once the moving party has met that burden, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (cleaned up). It is not enough to offer unsupported allegations or denials in the pleadings. *See* Fed. R. Civ. P. 56(c). Because the non-moving party must supply evidence that, if true, would allow a reasonable jury to find in his favor, the non-moving party "must have more than a scintilla of evidence to support [its] claims." *Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001). If the non-movant's evidence "is merely colorable, or is not significantly probative," the Court may grant summary judgment. *Anderson*, 477 U.S. at 249–50 (cleaned up).

## III.  ANALYSIS

### A.  Vantage is not Estopped from Advancing Any of its Arguments

#### 1.  Judicial Estoppel Does Not Apply

Before the Court addresses the merits of Vantage's contract claims, some table setting is in order. The Lloyd's/Catlin Reinsurers contend that certain arguments by Vantage are *off* the table. They first point to judicial estoppel. The doctrine bars a litigant from arguing a position that is directly contrary to a position that it took and prevailed on in a prior proceeding. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). The Lloyd's/Catlin Reinsurers claim that Vantage's position that it had a contractual relationship with the Reinsurers is the "*exact opposite* of a position Vantage successfully argued in its separate arbitration against ART." Catlin Mem. at 10 (emphasis in original). Vantage insists that its stance has remained consistent and that the arbitration panel did not accept the argument that the Lloyd's/Catlin Reinsurers incorrectly attribute to it. Vantage Mem. at 46. The Court agrees with Vantage.

Although trial courts invoke judicial estoppel at their discretion, three factors guide them: "(1) whether the party's later position is 'clearly inconsistent' with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage . . . if not estopped." *Temple Univ. Hosp., Inc. v. NLRB*, 929 F.3d 729, 733 (D.C. Cir. 2019) (cleaned up).  Courts have applied judicial estoppel when the prior proceeding was an arbitration.  *See, e.g.*, *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 758 F. Supp. 2d 211, 218 (S.D.N.Y. 2010).

The Lloyd's/Catlin Reinsurers claim that Vantage argued during arbitration that ART could not "disavow its obligations and duties [to pay Vantage] by characterizing itself as simply a pass-through" entity for the Reinsurers.  Catlin Mem. at 14 (quoting Catlin SUMF ¶ 245).  That much is true.  But they then claim that Vantage's arguments to this Court are "clearly inconsistent" because they include that ART was "essentially a conduit" to the Reinsurers.  Catlin Mem. at 13.  Vantage does not make precisely that claim, and the Lloyd's/Catlin Reinsurers do not get to reframe Vantage's arguments so that they are irreconcilable.

Vantage's position that the Reinsurers are liable on the same terms as ART is not entirely at odds with its argument during arbitration that ART has liability under the Credit Policy.  To be sure, the Court acknowledges the tension; indeed it helps doom Vantage's claim on the merits.  But "[d]oubts about inconsistency often should be resolved by assuming there is no disabling inconsistency, so that the second matter may be resolved on the merits."  *Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir. 2010).

More importantly, the Lloyd's/Catlin Reinsurers have not shown that the arbitration panel accepted Vantage's supposed arguments about the relationship of the Reinsurers to Vantage and ART.  In fact, the arbitration panel stated:  "The full picture of the formation and capitalization of ART . . . is unknown to us (and indeed we foreclosed Vantage's discovery efforts on that subject) . . . .  The sources of funds available to the award may include reinsurers that are not parties to this arbitration."  Vantage Mot. Ex. 98 at 1, ECF No. 144-98.  Especially given the panel's recognition that the Reinsurers might ultimately pay part of the award, if Vantage prevailed here it would hardly "create the perception that [the panel] was misled."  *Temple Univ. Hosp.*, 929 F.3d at 733.  "[J]udicial estoppel should not be applied if no judicial body has been led astray."  *Konstantinidis v. Chen*, 626 F.2d 933, 938–39 (D.C. Cir. 1980) (cleaned up).

Judicial estoppel serves as a backstop to prevent true threats to "judicial integrity."  *New Hampshire v. Maine*, 532 U.S. at 751.  There is no such threat here.

### 2.  Collateral Estoppel Does Not Apply

The Lloyd's/Catlin Reinsurers next argue that collateral estoppel bars Vantage's claims against them.  Catlin Mem. at 17–19.  They point to their arbitration with ART in which the panel concluded that ART's failure to give timely notice of its claim relieved them of their liability under the Panel Agreement to pay Vantage's money judgment.  *Id.* at 19.  But this argument misses the mark.

Under collateral estoppel, also known as "issue preclusion," once a judicial body "has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  *USPS v. Am. Postal Workers Union*, 553 F.3d 686, 696 (D.C. Cir. 2009) (cleaned up).  Collateral estoppel renders an "issue of fact or law" conclusive in a subsequent case when "(1) the issue is actually

litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair

opportunity for litigation by the parties or their privies; (4) under circumstances where the

determination was essential to the judgment, and not merely dictum." *Modiri v. 1342 Rest.*

*Group, Inc.*, 904 A.2d 391, 394 (D.C. 2006) (cleaned up). The party asserting collateral estoppel

bears the burden of showing that an issue in question is identical to what was decided before.

*Merle v. United States*, 683 A.2d 755, 762 (D.C. 1996); *see also Westchester Cnty. Corr.*

*Officers Benevolent Ass'n v. Cty. of Westchester*, 65 A.D.3d 1226, 1227 (N.Y. 2009) (collateral

estoppel under New York law also requiring "identical issue").[10]

The issue determined by the arbitration panel is not identical to what is now before the

Court. The Lloyd's/Catlin Reinsurers cite the arbitration's Final Award. But it reads:

> [The Lloyd's/Catlin Reinsurers] are not liable *under the terms of the Reinsurance*
> *Agreement STT7082* [Panel Agreement] for the Money Judgment, and any related
> award, that has been entered against Respondent relating to its arbitration against
> Vantage, namely the Vantage Claim arising from the default and subsequent
> bankruptcy of the Glacial Debtors.

Catlin Mot. Ex. 205 at 9, ECF No. 140-205 (emphasis added). So the arbitration panel assessed

the Lloyd's/Catlin Reinsurers' obligations to pay for Vantage's money judgment against ART

---

[10] The Court applies D.C. preclusion law here, as Vantage urges. The Lloyd's/Catlin Reinsurers
contend that New York's collateral estoppel rules apply because New York law governs the
Panel Agreement and the arbitration award "was rendered in New York." Catlin Mem. at 18 n.6
(citing Restatement (Second) of Laws § 95 (1988) ("What issues are determined by a valid State
judgment is determined . . . by the local law of the State where the judgment was rendered.")).
But the arbitration was not a state court judgment, and it was not confirmed by a New York court
or any court, for that matter. *See Patton v. Johnson*, 915 F.3d 827, 836 (1st Cir. 2019)
(characterizing as "an open question" the proper choice-of-law rules for determining the
preclusive effects of an unconfirmed arbitral award). Complicating the matter, "case law is
unclear whether collateral estoppel is procedural or substantive" law for vertical choice of law
purposes. *Bryson v. Gere*, 268 F. Supp. 2d 46, 56 (D.D.C. 2003). At any rate, the Lloyd's/Catlin
Reinsurers admit that the "choice of law here would not impact the outcome either way."
Lloyd's/Catlin Reinsurers' Combined Opp'n to Vantage's Cross-Mot. and Reply in Supp. of
Mot. for Summ. J. ("Catlin Reply") at 41, ECF No. 151. So the Court need not determine
whether New York or federal collateral estoppel rules should apply instead of D.C. common law.

*under the Panel Agreement*.  That determination does not touch whether the Reinsurers are liable to Vantage outside the four corners of the Panel Agreement.  Indeed, this Court has already explained that the existence and terms of the express agreements (e.g., the Panel Agreement) in this matter neither foreclose the possibility of implied contracts between Vantage and the Reinsurers nor cabin their terms.  *Vantage IV*, 2019 WL 1877097, at *2–4.

The Lloyd's/Catlin Reinsurers also cannot show that Vantage or its privy had "a full and fair opportunity for litigation."  *Modiri*, 904 A.2d at 394.  Vantage was not a party to the arbitration proceeding.  And despite the Lloyd's/Catlin Reinsurers' allegations of eleventh-hour collusion between Vantage and ART, privity requires parties "so identified in interest" that they "represent[] precisely the same legal right in respect to the subject matter of the case."  *Franco v. District of Columbia*, 3 A.3d 300, 305 (D.C. 2010).  It is not enough that Vantage would presumably have benefitted if the arbitration panel had ordered the Lloyd's/Catlin Reinsurers to pay bankrupt ART.  To conclude otherwise would suggest that creditors are automatically in privity with all their debtors.  More, even ART did not participate in the arbitration, which "proceeded on a default basis."  Catlin SUMF ¶ 309.  The Court will not apply collateral estoppel against Vantage on an issue tangential to an unconfirmed arbitration award against its bankrupt debtor, who did not even participate in the arbitration.

**B.  No Reasonable Jury Could Find the Existence of Any Contracts, Quasi-Contracts, or Promises Between Vantage and the Reinsurers (Counts VIII, IX, and X)**

Vantage contends that one way or another, the Reinsurers ultimately had to pay for a default if ART did not.  The Court dismissed Vantage's claim alleging that the Binders created an explicit contractual relationship between Vantage and the Reinsurers.  *Vantage II*, 2018 WL 6025774, at *2.  So Vantage proceeds now under the theory that it had an implied-in-fact contract with the Reinsurers or that it should recover under the doctrines of promissory estoppel

or unjust enrichment.  Before the Court examines these theories, it will address the parties' arguments on agency.

### 1. Vantage has Failed to Provide Facts Necessary to Show that ART or the Willis Defendants Were Agents of the Reinsurers

As part of its contractual theories, Vantage contends that Palmer, ART, and the Willis Defendants served as agents of the Reinsurers.  Am. Compl. at 17–18, 21, 47–48, ECF No. 96. For instance, Vantage alleges that after the Reinsurers "designat[ed] Palmer and ART PCC (and by extension Willis as manager of ART PCC)" as their agents, "Willis and Palmer sent the August 2013 Binder to Vantage confirming that the reinsur[ers] would pay on the same terms, conditions, and settlements as the Credit Policy."  Vantage Mem. at 41.  The Reinsurers counter that Vantage has not marshaled evidence from which a jury could find agency.

Principles of agency determine whether someone can act for another.  *See A-J Marine, Inc. v. Corfu Contractors, Inc.*, 810 F. Supp. 2d 168, 175 (D.D.C. 2011).  Depending on the circumstances, authority to act can be "actual" or "apparent."  *Id.*  The Court looks to D.C. law on both.[11]  As the party asserting an agency relationship, Vantage carries the burden of proof on this factual question.  *Railan v. Katyal*, 766 A.2d 998, 1010 (D.C. 2001).  It cannot meet that burden.

### a. None of the Entities had Actual Authority

Start with actual authority.  Here the focus is on the principal-agent relationship:  Did the principal in some way openly acknowledge that the agent would act for it so the agent could

---

[11]  While sitting in diversity, this Court relies on D.C.'s choice of law rules, which dictate that "the first step is to determine whether a 'true conflict' exists."  *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992).  Here no party identifies any material conflicts related to agency, contract formation, promissory estoppel, or unjust enrichment.  *See* Catlin Mem. at 23 n.8; Vantage Mem. at 32 n.35; Continental Mem. *passim*.  So the Court will stick to local law.  *See Greaves v. State Farm Ins. Co.*, 984 F. Supp. 12, 15 (D.D.C. 1997) ("The absence of a true conflict compels the application of District of Columbia law by default.")

reasonably believe it had authority?  *See A.J. Marine*, 810 F. Supp. 2d at 175; Restatement

(Third) of Agency § 3.01 ("Actual authority . . . is created by a principal's manifestation to an

agent that, as reasonably understood by the agent, expresses the principal's assent that the agent

take action on the principal's behalf.").  Actual authority can be express—written or spoken—or

implied through conduct.  *Sigal Constr. Corp. v. Stanbury*, 586 A.2d 1204, 1217–18 (D.C. 1991)

("Implied authority is actual authority inferred from the circumstances, such as the relationship

between the parties and conduct of the principal toward the agent manifesting the principal's

consent to have the agent act for him.").

### i.  There is No Evidence that Palmer or ART Had Actual Authority

For actual authority for Palmer and ART, Vantage hangs its hat on the "Key Man Clause"

in the Reinsurance Agreements.  *See* Vantage Reply at 35–36.  According to Vantage, this

contract provision appointed Palmer as the Reinsurers' "Key Man" and their "agent when he was

dealing with Vantage."  Am. Compl. at 21.  But Vantage does not explain how.  The Key Man

Clause does not mention any grant of power or agency.[12]  Rather, a plain reading of the

provision (identical in both contracts) suggests that Palmer was a critical functionary *of ART*—

not of the Reinsurers—so the Reinsurers could terminate or renegotiate their contracts with ART

if he left.  *See* Hannover Treaty at 18; Panel Agreement at 19.  One could, for example, imagine

a new investor in the Tampa Bay Buccaneers declare that his backing depends on Tom Brady

---

[12]  The Key Man Clause (Article XXXIII) states in its entirety:

"The named underwriter of [ART] is hereby noted as Paul Palmer.  In the event that Paul Palmer ceases to be employed by [ART], or an affiliate of [ART], then the Reinsurers shall have the right to terminate or renegotiate the terms of this Agreement as of the latest day of employment of Paul Palmer, but only in respect of Policies written on or after such date."

remaining as the Buccaneers' quarterback.  Such a provision would signal the crucial role that

Brady plays for the Buccaneers, not for the investor.

The only other evidence in the record confirms this reading.  Martin Hochstrasser, an

underwriter at Catlin, testified about the meaning of the provision and why he asked at the

drafting stage that Palmer add it to the agreements.  Catlin Mot. Ex. 20 at 5–6, ECF No. 140-20.

He explained that such a clause was typical when contracting with "small insurance companies

which are in the build-up phase" and "it would list one or several individuals or it would describe

the size of the team which has to be put in place to build out the insurance company."  *Id.*  So the

clause functions as an assurance *to the counterparty* (here, the Reinsurers), that the indispensable

individuals listed will stick around once the deal was complete.

As relevant here, Hochstrasser confirmed that the clause meant "Palmer was an important

figure for [Catlin] in dealing with ART," and "without him we would have wanted to have an

equivalent replacement."  *Id.*  So if anything, this clause empowered the Reinsurers, not Palmer

or ART.  Palmer confirmed this at his deposition.  He agreed that "a key man" means "as the

name suggests, a person who is critical to the functioning of the entity."  Catlin Mot. Ex. 23 at 9,

ECF No. 140-23.

Against this evidence, Vantage offers nothing but a bare assertion that the Key Man

Clause was a grant of agency power.  That would not be enough for a jury to find agency given

that the burden is on Vantage, and it is not enough to survive summary judgment now.

### ii.  There is no Evidence that the Willis Defendants Had Actual Authority

Vantage fares no better when it comes to the Willis Defendants, which it lumps together

as one despite their different roles in the transactions.  Vantage here zeroes in on the

Intermediary Clause of the Panel Agreement.  It states that Willis London and Willis Re, Inc.

"are recognized as the intermediaries negotiating this Contract, through whom all communications and payments relating thereto shall be transmitted to both parties." Panel Agreement at 4.

But this designation of Willis London as a middleman does not suffice to establish agency on behalf of one side, particularly the Reinsurers. *See Travelers Indem. Co. v. Booker*, 657 F. Supp. 280, 287 (D.D.C. 1987) (explaining that designation of insurance broker as an "intermediary" did not transform broker into authorized agent of the insurers). The "handling of such routine matters" as transmitting communications or even premium payments "is certainly not a special circumstance sufficient to make [a broker] an agent of the [Reinsurers]." *Id.*[13]

Here again, the only other evidence in the record cuts against Vantage's allegations. ART's broker at Willis London, Brian Stewart, testified that the Intermediary Clause existed to permit Willis London "to help facilitate the workings of the [reinsurance] contract" by "negotiating [its] terms," managing "the flow of premium from and to reinsurers, and claims back the other way," and delivering "any information that should be sent to reinsurers." Catlin Mot. Ex. 27 at 48, ECF No. 140-27. None of these "ministerial" duties smacks of an agency power to bind any party in *new* contracts. *Travelers Indem.*, 657 F. Supp. at 287. Stewart also answered questions directly about agency, denying that he ever "represented [himself] to Vantage as the agent of the reinsurers," "enter[ed] into any contracts with Vantage," or had "any

---

[13] Even if Willis London had been serving as an agent, it would have been as ART's agent, not the Reinsurers'. In the international insurance market, "[n]ormally . . . brokers are the agents of the person who first employs them, and if, as here, they are employed to procure insurance, they are the agents of the insured." *Travelers Indem.*, 657 F. Supp. at 286. So too for Willis London, which Palmer hired on commission to find Reinsurers for ART. *See* Vantage SUMF ¶ 86; Catlin SUMF ¶¶ 112–21. Specific terms in the Panel Agreement could, of course, have superseded that pre-existing relationship and established Willis London as the agent of the Reinsurers. But Vantage fails to show how the Intermediary Clause does so.

interactions with Vantage" at all.  Catlin Mot. Ex. 27 at 49, ECF No. 140-27.  Vantage offers no evidence in rebuttal to show that the Intermediary Clause is more than it says it is.

Willis Vermont had a different role in these events.  ERS (Palmer's company) retained Willis Vermont as the special purpose insurance manager for ART.  *See* Catlin SUMF ¶¶ 20–21; Vantage SUMF ¶¶ 76–77.  ERS paid Willis Vermont to license ART in the District of Columbia and for ongoing management services.  Catlin Mot. Ex. 33 at 3, ECF No. 140-33.  But a grant of actual authority requires "a principal's manifestation"—express or implied—"*to an agent* that as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf."  Restatement (Third) of Agency § 3.01.  Vantage identifies no communication or interaction between Willis Vermont and any Reinsurer.  None of the Willis entities had actual authority to act for the Reinsurers.[14]

### b. None of the Entities had Apparent Authority, and there is No Evidence that the Reinsurers Ratified their Authority After the Fact

Actual authority aside, a party may bind another if it acts with apparent authority.  Here the focus is on the principal's manifestations to a relevant third party.  "Apparent authority is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation."  *A-J Marine*, F. Supp. 2d at 176–77 (cleaned up); *see also* Restatement (Third) of Agency § 3.03 cmt. b. ("Apparent authority is

---

[14]  As they did in their initial motion to dismiss, the Willis Defendants contend that Willis Re Inc. of North Carolina was not involved in these transactions and must have been included in the Panel Agreement by mistake.  Willis Mot. at 14 n.6.  Other Defendants agree.  *See* Catlin SUMF ¶ 138 at n.7.  Vantage never disputes this fact, and it does not explain Willis Re Inc.'s involvement in its briefing.  For this reason alone, Defendant Willis Re Inc. is entitled to summary judgment.  *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by [a] defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

present only when a third party's belief is traceable to manifestations of the principal."). So "apparent authority does not depend upon any manifestation from the principal to [its] agent, but rather *from the principal to the third party*." *Makins v. District of Columbia*, 861 A.2d 590, 594 (D.C. 2004) (cleaned up) (emphasis added). "The third party's perception may be based upon written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on [its] behalf by the person purporting to act for [it]." *Id.*

Vantage identifies no such conduct by the Reinsurers. There is no evidence of any communications or interactions between Vantage and the Reinsurers until 2017, well after the events at issue. *See* Catlin SUMF ¶ 142. Vantage does not dispute this fact. Vantage Mem. at 42. So there is nothing in the record from which a jury could find that Vantage reasonably believed that any of the entities acted with apparent authority on behalf of the Reinsurers.

Vantage instead invokes "agency by estoppel," under which "a principal may be estopped from denying apparent authority if the principal intentionally or negligently created an appearance of authority in the agent, on which a third party relied in changing its position." *DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co.*, 388 F.3d 886, 890 (D.C. Cir. 2004). Agency by estoppel does not require that the principal make any overt manifestation to the third party or agent. *A-J Marine*, 810 F. Supp. 2d at 182. So estoppel "allows for a more attenuated connection between a principal's actions or inactions and a third party's perception of the actor's agency." *Id.* On the other hand, there must be some conspicuous action or inaction by the principal, or else the third party's belief in agency would not be reasonable. *Id.*; *cf. DBI Architects*, 388 F.3d at 894 (finding credit card issuer reasonably believed that fraudulent user could use card because company cardholder "repeatedly paid thousands of dollars in fraudulent

charges for almost a year after [receiving] monthly billing statements identifying the fraudulent user and itemizing the fraudulent charges").

For intentional or negligent actions by the Reinsurers creating the appearance of agency, Vantage explains that it "reasonably relied on the appearance of authority that Reinsurers had vested in ART PCC and Willis, when Reinsurers authorized Palmer and Willis to convey the [Reinsurance] Placement Slips and Binders to Vantage with a representation of the Reinsurers' obligations." Vantage Mem. at 41. There are several problems with that argument.

*First*, only two of the Reinsurers (Hannover Re and Partner Re) signed Reinsurance Placement Slips. *See* Catlin Mot. Ex. 46 at 7, Ex. 52 at 8, ECF Nos. 140-46, 140-52. *Second*, Vantage provides no support for its contention that the Reinsurers "authorized" Palmer and Willis "to convey" anything, much less with "Hannover [Re] and Partner Re's knowledge and consent." Vantage Mem. at 40–41. Had there been such evidence, it would have established actual authority to act. *Third*, and most importantly, Vantage's argument is circular: It says that it reasonably believed that Palmer and Willis acted on behalf of the Reinsurers when they conveyed the Reinsurance Placement Slips and Binders just *because* they conveyed the Reinsurance Placement Slips and Binders. This entirely cuts the principal out of the agency analysis. "Apparent authority is present only when a third party's belief is *traceable to manifestations of the principal*." Restatement (Third) of Agency § 3.03 cmt. b. Here Vantage presents no independent conduct by the Reinsurers that would lead a reasonable observer in Vantage's shoes to assume agency.

Vantage lastly seeks refuge in ratification. It alleges that if actual or apparent authority was lacking, the Reinsurers later "ratified" the actions of their agents and thus "cure[d] any defect in agency." Vantage Mem. at 39. Vantage is correct that ratification can retroactively

supply missing authority.  If a principal, with knowledge of an unauthorized act, "acquiesces in it, by allowing the agent to do similar acts, or by retaining the benefits of the act when it was done in service to him, then the past unauthorized act is ratified."  *Lewis v. WMATA*, 463 A.2d 666, 671 (D.C. 1983).  But "[t]he agent must have purported to act on behalf of the principal."  *Id*. at 672.  And the standard for ratification under D.C. law is "exacting."  *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 465 (D.C. Cir. 1989).  The "conduct which implies ratification must be conduct which is inconsistent with any other hypothesis."  *Id.* (cleaned up).

That standard is not met here.  Vantage offers that the "Reinsurers specifically reviewed the Binders, confirmed coverage after review, and accepted premiums for the transaction."  Vantage Mem. at 39–40.  To be sure, in early 2013 Palmer emailed the 2012 Binder to Hannover Re and Partner Re "for [their] records."[15]  Vantage Mot. Ex. 27 at 1, ECF No. 144-27; *see also* Catlin SUMF ¶¶ 68–74; Vantage Response to SUMF ¶¶ 68–74.  Representatives from both reinsurers confirmed receipt of the binder and acknowledged that it accurately described what the companies' coverages would be.  *See* Vantage Ex. 55 at 2, ECF No. 144-55; Vantage Ex. 28 at 1, ECF No. 144-28.  The Court has already found that the 2012 Binder neither contained a contract involving the Reinsurers nor was a contractual offer; it merely "disclose[d] the existence of the reinsurance policy and its terms."  *Vantage II*, 2018 WL 6025774, at *2.  That the insurers confirmed the accuracy of the description in the binder is unremarkable.  And it is surely not "inconsistent with any other hypothesis" other than the insurers' ratification of a separate, implied contract entered into on their behalf by Palmer.  *Kuwait Airways*, 890 F.2d at 465.

---

[15]  There is no evidence that Palmer ever sent the 2013 Binder to any of the Reinsurers.  *See* Catlin SUMF ¶ 79; Pl.'s Statement of Genuine Issues of Material Fact ("Vantage Response to SUMF") ¶ 79, ECF No. 146.

More, the premiums that the Reinsurers accepted track what they would have expected under the Hannover Treaty and Panel Agreement.  And the purported agents—the Willis Defendants and Palmer—denied acting on behalf of the Reinsurers with the binders.  *See* Answer of Willis Defs. ¶ 65, ECF No. 93; Catlin Mot. Ex. 24, ECF No. 140-24 ("The binder [was] sent on behalf of ART PCC, not the reinsurers.").  The evidence for ratification is insufficient.

### 2.  Vantage Fails to Produce Evidence to Support Any Implied Contracts[16]

The crux of Vantage's current complaint is that there was an implied contractual arrangement between itself and the Reinsurers.  Am. Compl. at 46–47.  This type of contract requires "all the necessary elements of an express contract—including offer, acceptance, and consideration."  *Paul v. Howard Univ.*, 754 A.2d 297, 311 (D.C. 2000).  So there still must be "a 'meeting of the minds' as to all material terms."  *Bailey v. Fed. Nat. Mortg. Ass'n*, 209 F.3d 740, 746 (D.C. Cir. 2000).  An implied contract "differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt."  *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C. Cir. 1979).  As the party asserting the contract's existence, Vantage bears the burden of proof.  *Bailey*, 209 F.3d at 746.

When Vantage first appeared before the Court, it alleged that the Reinsurers were *explicitly* liable for its losses because of the insurance Binders.  *See* Compl. at 12–16, 35–36.  But the Court dismissed its breach of contract claim: "Vantage [could not] show that it ha[d] a direct contractual relationship with the Reinsurer Defendants."  *Vantage I*, 321 F. Supp. 3d at 59.  The Court permitted Vantage to add a claim for breach of an implied contract on the theory that

---

[16]  Because the Court finds that Vantage has failed to provide evidence supporting an implied-in-fact contract, it need not address the Reinsurers' other defenses, such as that any implied contract would violate the Statute of Frauds or that there was no breach of the alleged contract.

"ART and the Willis Defendants acted as agents *for* the Reinsurer Defendants" and bound them. *Vantage II*, 2018 WL 6025774, at *3 (emphasis in original); *see also* Am. Compl. at 17–18, 21, 46–48.

Now, after discovery, Vantage has failed to provide facts sufficient for agency, so that theory must fail. *See supra* at III.B.1. But Vantage's opposition brief on summary judgment declares that "the facts obtained through discovery moot the issue of agency." Vantage Mem. at 38. Switching tracks yet again, Vantage now argues that the Reinsurers contracted with Palmer—who was serving as an agent *for Vantage*—and agreed to "direct obligations to Vantage." *Id.*

Courts rarely allow plaintiffs to change their legal theories once briefing is underway, especially when new theories depart from what appears in the operative complaint. *Sloan v. Urb. Title Servs., Inc.*, 689 F. Supp. 2d 94, 114 (D.D.C. 2010) (rejecting novel breach of contract claim appearing at summary judgment stage that was "directly at odds with" theory in complaint). The typical course is for a court to reject any novel allegations and legal theories introduced in briefing and grant summary judgment for the opposing party on those issues. *See Kargbo v. Nat'l R.R. Passenger Corp.*, 243 F. Supp. 3d 6, 12 n.4 (D.D.C. 2017). But the Court will nonetheless briefly examine Vantage's latest theory—which quickly collapses.

The new implied contract theory appears to be this: The offer was Palmer proposing to Hannover Re and Partner Re that they *directly* insure Vantage for "losses covered by the Credit Policy" and on "the same terms, conditions, and settlements" as that policy. Vantage Mem. at 32–33. The acceptance was those entities signing the Reinsurance Placement Slips and sending them to Palmer, as well as their conduct in "ratifying" the 2012 Binder. *Id.* at 33–36. And the consideration was the premium payments that Vantage paid [to ART], which ended up with the

Reinsurers.  *Id.* at 36.  The other Reinsurers joined this implied contract when they "replaced Allied World and participated in the Credit Policy."  *Id.* at 37.

Here is an illustration of Vantage's current theory (in grey) atop the undisputed contractual obligations:



This theory ignores the existence of ART as a functioning entity and contravenes the express terms of the Credit Policy and the Reinsurance Agreements.  Indeed, the Credit Policy does not mention the existence of any additional insurers other than ART.  Catlin Mot. Ex. 71, ECF No. 140-71.  But under this theory, Vantage was apparently directly insured by the Reinsurers—through the implied contract established by the Reinsurance Placement Slips and Binders—as well as directly insured by ART for up to another $22 million.  *See id.* at 2.

The theory conflicts with the record at many points, but it fails most crucially based on a lack of independent consideration.  The Credit Policy required Vantage to pay ART 12% of the

policy limit, which for 2013 was $2.4 million.  Vantage Response to SUMF ¶¶ 167–69.  The

Reinsurance Agreements together required ART to then pay $800,000 to the Reinsurers.  *Id.*

¶ 172; *see also* Catlin Mot. Ex. 24 at 30, ECF No. 140-24.  Vantage identifies no other

consideration that the Reinsurers received for allegedly obligating themselves to cover Vantage

directly *and on top of* the risk that they assumed on behalf of ART.  And there is no evidence of

payments from Vantage directly to the Reinsurers for this newly alleged implied contract.

No contract—express or implied—can exist without independent consideration.  *See*

*Steele v. Isikoff*, 130 F. Supp. 2d 23, 33 (D.D.C. 2000) (dismissing breach of contract claim

because alleged implied-in-fact contract "lack[ed] any independent, valid consideration" from a

preexisting contract).  A contract without consideration is like water without oxygen: an

impossibility.  Vantage has not presented evidence on a necessary element of contract formation,

so the Court will grant summary judgment to the Reinsurers on Vantage's claim for breach of the

implied contract (Count VIII).[17]

### 3.  Vantage Cannot Recover Under Promissory Estoppel or Unjust Enrichment

In Count IX, Vantage alleges a promissory estoppel claim.  Am. Compl. at 47–48.

Promissory estoppel requires a party to prove "(1) a promise; (2) that the promise reasonably

induced reliance on it; and (3) that the promisee relied on the promise to his or her detriment."

*Myers v. Alutiiq Int'l Solutions, LLC*, 811 F. Supp. 2d 261, 272 (D.D.C. 2011).  The "promise

need not contain language as specific and definite as that of an enforceable contract." *Osseiran v.*

*Int'l Fin. Corp.*, 498 F. Supp. 2d 139, 147 (D.D.C. 2007).  But reliance on an indefinite promise

---

[17]  Having determined that Vantage's (new) implied contract theory lacks an essential element—
consideration—the Court need not address evidence and arguments on the other elements of
contract formation.

is unreasonable, so the promise must have definite terms on which the promisor would expect the promisee to rely. *Granfield v. Cath. Univ. of Am.*, 530 F.2d 1035, 1040 (D.C. Cir. 1976).

As pled, Vantage's promissory estoppel claim relied on ART and the Willis Defendants serving as the Reinsurers' agents: "By providing Vantage with the Credit Insurance Binders through their agents, ART PCC and Willis, Reinsurer Defendants effectively promised that they would pay Vantage's losses on the 'on the same terms, conditions, and settlements as the' Credit Insurance Policy." Am. Compl. at 47. Having determined that Vantage failed to provide evidence of agency, *see supra* at III.B.1, this claim must fail. The Court will grant summary judgment to the Reinsurers on Count IX.[18]

The Court will likewise grant summary judgment for the Reinsurers on Vantage's claim for Unjust Enrichment (Count X). Vantage pled that it "conferred a benefit on Reinsurer Defendants by paying premiums to them through their agents, ART PCC and Willis" and that they "retained the benefits paid by Vantage without providing value in return." Am. Compl. at 48. Without agency, Vantage's unjust enrichment claim is no longer viable.[19]

### C. The Economic Loss Rule Bars the Claims Against the Willis Defendants

At the center of Vantage's tort claims against the Willis Defendants are two purported errors: (1) permitting the 2012 Binder to state that Reinsurance was ceded "on the same terms, conditions and settlements as the original policy," Vantage Mem. at 50, and (2) failing "to

---

[18] Vantage barely addresses its Promissory Estoppel claim in its opposition brief. Vantage contends that "if the Court were to grant Defendants' motion[s] as to the implied contract claims, the undisputed facts demonstrate an issue for trial on Vantage's quasi-contract claims"—but then Vantage does not elaborate. Vantage Mem. at 49. Similarly, Vantage does not mention promissory estoppel at all in its reply. *See* ECF No. 158.

[19] Having granted summary judgment rejecting all Vantage's claims against the Reinsurers, the Court need not determine the meaning of the phrase "same terms, conditions and settlements" that appears in the Reinsurance Placement Slips and the Binders. *See* Vantage Mem. at 29.

convey sufficient and timely information about Vantage's loss to the Reinsurers" to ensure that they paid the claim, *id.* at 59.  Vantage has four extant claims: negligence, professional negligence, negligent undertaking, and negligent misrepresentation.  Am. Compl. at 39–46.  The Willis Defendants move for summary judgment on all four, Willis Mot. at 5, while Vantage asks the Court to rule that Willis owed Vantage a duty of care on all its claims, Vantage Mem. at 49.  The Court will grant summary judgment for the Willis Defendants.

Before even addressing the claims, the parties disagree over what law applies.  The Willis Defendants contend that Vermont law controls when Willis Vermont's actions are at issue, Willis Mot. at 33–34 n.8, and that the United Kingdom's law applies when the focus shifts to Willis London, *id.* at 51 n.15.  The Court accepts Vantage's claim that D.C. law applies throughout.  *See* Vantage Mem. at 51 n.45.

As before, the Court applies D.C.'s choice of law rules, which direct courts first to "determine whether a 'true conflict' exists" between the jurisdictions.  *GEICO*, 958 F.2d at 1141.  The Court here starts and ends with the economic loss rule, which exists in all three jurisdictions without meaningful differences.  So the Court will apply D.C. law.  *Id.*

"Generally, under the economic loss rule, a plaintiff who suffers only pecuniary injury as a result of the conduct of another cannot recover those losses in tort."  *Aguilar v. RP MRP Wash. Harbour, LLC*, 98 A.3d 979, 982 (D.C. 2014) (adopting rule in the District).  And without a legally-recognizable injury, a negligence claim must fail.  *See Intelect Corp. v. Cellco P'ship GP*, 160 F. Supp. 3d 157, 180 (D.D.C. 2016) (outlining negligence generally).

But the "special relationship" exception permits negligence claims based on solely economic losses where a defendant, based on its pre-existing relationship with the plaintiff, had a reason to look out for the plaintiff's "economic well-being."  *Aguilar*, 98 A.3d at 985.  The

touchstone of this "limited exception" is not the foreseeability of the loss but the nature of the relationship.  *Id.* at 985–86.  This connection could be an "intimate nexus" or "close nexus" between the parties, which a plaintiff may show through "contractual privity or its equivalent." *Id.* at 985 n.3 (citing other jurisdictions).  The existence of a special relationship is a question of law.  *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 205 (D.C. 2017).

In *Whitt*, the D.C. Court of Appeals applied the special relationship exception to hold that the economic loss rule did not bar the plaintiff's negligence claims.  *Id.* at 206.  A salon owner sued a gas company and contractor for negligence, alleging that their multi-year construction project just outside her salon harmed her business.  *Id.* at 200.  The court determined that a special relationship existed "[g]iven th[e] extensive activity over a prolonged period, and the provisions of the [construction] permit specifically protecting [the owner] from the effects of this very conduct."  *Id.* at 206.  That the damages there did not result from an "isolated and unexpected occurrence" distinguished other cases in which the parties had a pre-existing relationship but the losses were not recoverable.  *Id.* at 205–06 (citing *Aguilar*, 98 A.3d at 983 n.2).  Those defendants were essentially on notice that their work could "implicate [the owner's] economic expectancies" given her many complaints to them and the construction permit explicitly requiring them not to hinder access to her business.  *Id.* at 205–06.

The court ruled the other way in *Aguilar*.  There, "cooks, servers, bartenders, receptionists, hairstylists" and other retail employees of shops in the Washington Harbour complex sought to recover lost wages from the property's owners.  *Aguilar*, 98 A.3d at 980. They alleged that the defendants negligently failed to raise flood walls to protect against a flood from the Potomac River that damaged the complex and temporarily shuttered their employers. *Id.* at 980–81.  The employees suffered "without a source of income for some time."  *Id.* at 981.

The court declined to apply the special relationship exception, stressing the lack of a direct connection between the landlords and plaintiffs, who were not tenants but employees of the tenant businesses in the complex. *Id.* at 985. The court also cited the "many variables beyond [the defendants'] negligence" that could "prove determinative of the likelihood of serious economic harm" to the plaintiffs. *Id.* n.4.

Mindful of the exception's "limited" scope, *id.* at 982, the Court determines that it does not apply here. There was no "contractual privity or its equivalent" between Vantage and any of the Willis entities. *Id.* at 985 n.3. Indeed, the Court dismissed Vantage's breach of contract claim against the Willis Defendants because there was no contractual relationship. *See Vantage I*, 321 F. Supp. 3d at 62. The Willis Defendants were one step removed from Vantage—with ART in between—like in *Aguilar* in which the retail employers stood between the aggrieved employees and the allegedly negligent landlords. Nor did the parties here otherwise have anything approaching an "intimate nexus." *Aguilar*, 98 A.3d at 985 n.3. Vantage does not dispute that it had zero communications with Willis London personnel. Vantage Response to SUMF ¶ 120. And Vantage had, "at most, a single phone call and one or two written communications" with Willis Vermont. Willis Defs.' Mem. of P. & A. in Further Support of their Mot. for Summ. J. at 26, ECF No. 153.

Nor were the Willis Defendants, for example, put on notice of the precise economic harms they were unilaterally causing over a multi-year period after expressly denying that they would inflict those exact harms on the exact victim that they did. *Cf. Whitt*, 157 A.3d at 206. Vantage sues the Willis Defendants despite their small role in a cascade of errors—seemingly most attributable to Palmer—that led to the Reinsurers successfully denying ART's claim. With the various moving parts, there were "many variables beyond" the Willis Defendants' alleged

negligence that could have "prove[n] determinative of the likelihood of serious economic harm" to Vantage.  *Aguilar*, 98 A.3d at 985 n.3.

Vantage suggests that the Willis Defendants must have been aware of the risk that Vantage would go uncompensated if they "failed to take appropriate measures to ensure payment by the Reinsurers."  Vantage Mem. at 65.  Even if this were true, "both *Aguilar* and *Whitt* make clear that foreseeability alone is insufficient to establish a special relationship."  *McDowell v. CGI Fed. Inc.*, No. CV 15-1157 (GK), 2017 WL 2392423, at *5 (D.D.C. June 1, 2017) (rejecting special relationship between identity theft victim and government contractor whose employees stole her identify).

Simply put, the special relationship inquiry requires exactly that—a relationship that by its nature puts a party on notice that it owes someone special protection from economic losses.  For the Court to find that here, it would have to stretch this limited exception beyond where D.C. courts have employed it or seem willing to extend it.  *See Aguilar*, 98 A.3d at 985 ("It would be an extraordinary step for us to conclude that a commercial landowner is in a special relationship with each of its tenants' employees.").  Without the exception, the economic loss rule applies as normal and bars Vantage's negligence claims.

### D.  The Counterclaim Fails

The Lloyd's/Catlin Reinsurers advance a counterclaim against Vantage for tortious interference.  *See* Answer and Countercl. at 59–62, ECF No. 128.  They assert that Vantage tortiously interfered with the Panel Agreement by inducing ART to breach it.  More particularly, they allege that, in exchange for Vantage halting its collection efforts against ART under the Credit Policy, ART withdrew its pending motion to dismiss in this Court and agreed to file an answer "consistent" with Vantage's litigation position.  Catlin Reply at 57–58.  And the

Lloyd's/Catlin Reinsurers contend that this conduct violated the Panel Agreement, which required ART to act under a "standard of utmost good faith and fair dealing."  Panel Agreement at 6.  They also point to Vantage demanding payment from the Reinsurers of the money judgment that it secured against ART.  Catlin Reply at 57.  Vantage moves for summary judgment and urges dismissal.  Vantage Mem. at 69–73.  The Court agrees with Vantage.

A claim for tortious interference with a contract requires proof of four elements:  "(1) [the] existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages."  *Onyeoziri v. Spivok*, 44 A.3d 279, 286 (D.C. 2012).  The interference need not cause an actual breach of the contract but may cause "merely a failure of performance" by one of the parties.  *Casco Marina Dev., L.L.C. v. District of Columbia Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003).  Once a plaintiff has established a prima facie case, the burden shifts to the defendant to show that any interference "was legally justified or privileged."  *Onyeoziri*, 44 A.3d at 287 (cleaned up).  The legal privilege defense protects an actor "only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means."  *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 901 (D.C. 2008) (citing Restatement (Second) of Torts § 773 (1979)).

Vantage's demand for payment does not support relief.  The Lloyd's/Catlin Reinsurers never explain how Vantage merely demanding payment from the Reinsurers interfered with the normal operation of the Panel Agreement.  They also disclaim any argument that Vantage pursued this litigation in bad faith.  Catlin Reply at 59 n.40.  And absent a showing of bad faith, a pre-litigation demand for payment is an activity that falls within the legal privilege defense.  *See*

*In re Ashby Enters., Ltd.*, 47 B.R. 394, 397 (D.D.C. 1985) (affirming summary judgment and concluding privilege protected demand for payment and threats to sue that preceded lawsuit); *cf. Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345 (D.C. 2015) ("If the litigation underlying the *lis pendens* filing was pursued in good faith, then both it and any notice of *lis pendens* filed in connection with that action are privileged and thus cannot form the basis for any valid claim of tortious interference."). Vantage did not tortiously interfere with the Panel Agreement by marching through the normal steps of litigation on its claims that the Reinsurers were liable.

Nor can the Lloyd's/Catlin Reinsurers recover on their theory that Vantage induced ART to breach the Panel Agreement. They point to boilerplate language in the Panel Agreement stating that the "performance of obligations by both parties under [the agreement] shall be in accordance with a fiduciary standard of utmost good faith and fair dealing." Panel Agreement at 6. But if that ambiguous command restricts ART's behavior, it does so only for its "obligations . . . under the agreement."

The Lloyd's/Catlin Reinsurers' theory of relief suggests that ART would violate the good faith provision—and thus breach the Panel Agreement—through its litigation decisions in a lawsuit (this one) where a third party sued both ART and the Reinsurers based on an allegedly separate (implied) contract to which ART was not even a party. That is too attenuated. Even granting the allegations of a "secret side deal"—which Vantage strenuously denies, *see* Vantage Reply at 43–45— the Lloyd's/Catlin Reinsurers fail to show a connection to and interference with the Panel Agreement.

In any event, the Lloyd's/Catlin Reinsurers fail to satisfy the damages prong of tortious interference. Damages here could take the form of "pecuniary loss of the benefits of the

contract . . . consequential losses for which the interference is a legal cause," and "emotional distress or actual harm to reputation." *Havilah*, 108 A.3d at 353 (citing Restatement (Second) of Torts § 774A). To be sure, at the summary judgment stage a plaintiff generally "need not . . . show the amount of damages"; "he is obligated to show [only] that they exist and are not entirely speculative." *Rafferty v. NYNEX Corp.*, 744 F. Supp. 324, 331 n.26 (D.D.C. 1990).

But the Lloyd's/Catlin Reinsurers have not even cleared this low bar. They offer only that the alleged interference "resulted in the Lloyd's/Catlin Reinsurers having to defend against Vantage's [legal] claims ***and*** having to prove ART's breach of the Panel Reinsurance Agreement before a separate arbitration panel, in addition to other losses." Catlin Reply at 60 (double emphasis in original). They include no citations to the record or to calculated estimates. "[C]onclusory statements unsupported by specific facts as to the nature and extent of damages" are not enough. *Whetstone Candy Co. v. Nat'l Consumers League*, 360 F. Supp. 2d 77, 82 (D.D.C. 2004) (granting summary judgment on tortious interference claim because claimant failed to show damages); *cf. Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 66 (D.D.C. 2011) (finding damages estimate sufficient where plaintiff "clearly articulated the basis for its estimate, namely, a 9% increase in labor costs, which could be adjusted based on evidence presented at trial").

At bottom, the Lloyd's/Catlin Reinsurers have offered no evidence of damages. Under these circumstances, a reasonable juror would have no basis to conclude that the Lloyd's/Catlin Reinsurers suffered a pecuniary harm at the hands of Vantage. The Court will grant summary judgment for Vantage on the tortious interference counterclaim.

## IV.  CONCLUSION

To be sure, this is a tough result for Vantage.  But the parties here were all sophisticated actors, and they agreed to this unique insurance scheme via a succession of extensively negotiated, arm's-length contracts.  The design left Vantage in a vulnerable spot, relying on a novel and under-capitalized entity for insurance coverage and for access to fully capitalized reinsurers.  And today it leaves Vantage with nothing.

Perhaps Vantage could have sought other methods of obtaining relief, such as negotiating an assignment of rights with ART or funding ART's participation in the arbitration against the Reinsurers.  But what Vantage cannot do is what it tried here—leaping over its insurer to sue its insurer's insurers on phantom contract claims and its insurers' brokers on tort claims. Unsurprisingly, there is no case law supporting Vantage's novel theories.  Neither the facts nor the law supports Vantage's attempts to cherry-pick language from the enforceable contracts to retroactively devise a new contract unsupported by any consideration.

If the reinsurers received a windfall, that is because of failures that were irrelevant to the legal theories advanced in this case.  Courts, even when acting in equity, are strictly bound by the theories and facts presented to them.

*   *   *

For these reasons, the Court will grant the Willis Defendants' Motion for Summary Judgment, grant in part and deny in part the Lloyd's/Catlin Reinsurers' Motion for Partial Summary Judgment, grant the Continental Reinsurers' Motion for Summary Judgment, and grant in part and deny in part Vantage's Cross Motion for Partial Summary Judgment.[20]  A separate Order will issue.

Dated: March 31, 2021

_____

TREVOR N. McFADDEN, U.S.D.J.

---

[20]  The Lloyd's/Catlin Reinsurers' requested leave to file a sur-reply.  Mot. for Leave to File Sur-Reply to Vantage Commodities Financial Services I, LLC's Reply in Support of Pl.'s Cross-Mot. for Partial Summ. J., ECF No 159.  Vantage opposed the motion.  Vantage's Opp'n to Lloyd's/Catlin's Mot. to File a Sur-Reply, ECF No. 160.  And seeking the last word, the Lloyd's/Catlin Reinsurers filed a Reply Brief.  Reply in Support of Mot. for Leave to File Sur-Reply, ECF No. 162.  The Court does not agree that Vantage introduced any new arguments in its reply brief, *see* ECF No. 158, that would merit a sur-reply.  *See Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003) (noting that sur-replies are appropriate when a reply brief introduces new arguments).  In any event, the proposed sur-reply would not affect how the Court resolves the cross-motions for summary judgment.